UNITED STATES of America, Appellee,

v.

CITY OF FORT PIERRE, SOUTH DA-KOTA; James Hoffman in his Official Capacity as Mayor, City of Fort Pierre, South Dakota, Appellants.

State of South Dakota.

No. 84–1162.

United States Court of Appeals, Eighth Circuit.

Submitted June 16, 1984.

Decided Oct. 31, 1984.

Charles Poches, Jr., Fort Pierre, S.D., Horace R. Jackson, Rapid City, S.D., for appellants.

Thomas H. Pacheco, Robert L. Klarquist, Dept. of Justice, Washington, D.C., for appellee.

Before HEANEY and FAGG, Circuit Judges, and COLLINSON,* Senior District Judge.

FAGG, Circuit Judge.

The Fort Pierre Slough (Slough) is located within the City of Fort Pierre, South Dakota (City). In August of 1980, the City, for legitimate health and safety reasons, constructed two unfinished streets across the Slough. In July of 1981, the Army Corps of Engineers (Corps) brought suit against the City claiming that the Slough is a "wetland" within the jurisdiction of the Corps and claiming further that the City violated sections 301 and 404 of the Clean Water Act, 33 U.S.C. §§ 1311, 1344, when it failed to obtain a permit before constructing streets across the Slough. No other basis of jurisdiction was asserted by the Corps, and the only jurisdictional issue fully and fairly litigated below was the issue of the Corps' jurisdiction over the Slough as a wetland. Following trial, the district court concluded that the Slough was a wetland within the jurisdiction of the Corps and that the City had violated the Clean Water Act when it failed to obtain a permit prior to beginning construction of the two streets. We disagree and therefore reverse the decision of the district court, 580 F.Supp. 1036 (D.S.D. 1983).

I.  Legislative Framework

In enacting the Clean Water Act, 33 U.S.C. §§ 1251–1376, Congress intended "to restore and maintain the chemical, physical, and biological integrity of our Nation's waters," 33 U.S.C. § 1251(a), by enacting "a comprehensive program for controlling and abating water pollution," *Train v. City of New York*, 420 U.S. 35, 37, 95 S.Ct. 839, 841, 43 L.Ed.2d 1 (1975). To accomplish this goal, Congress provided that "the discharge of any pollutant * * * [into the waters of the United States] shall be unlawful." 33 U.S.C. 1311.

This general prohibition is not without exception, however. For example, section 404 of the Clean Water Act authorizes the Secretary of the Army to. "issue permits * * * for the discharge of dredged or fill material into the [waters of the United States]." 33 U.S.C. § 1344(a); *see also* 33 U.S.C. § 1362(7) (defining "navigable waters" to mean "waters of the United States"). The authority to issue these permits has been delegated by the Secretary to the Corps, 33 C.F.R. 325.8, which, consistent with this delegation, has promulgated a regulation defining the term "waters of the United States" to include wetlands, 33 C.F.R. § 323.2, and further defining the term "wetlands" to mean "those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions." *Id.* § 323.2(c).

■ When determining whether the Corps' jurisdiction over our Nation's wetlands extends to a particular area, a court must bear in mind Congress' intent to extend this jurisdiction to the full extent permissible under the Constitution. *See United States v. Tilton*, 705 F.2d 429, 431 (11th Cir.1983). We do not question the Corps' broad, plenary authority to protect, maintain, and restore our Nation's wetlands,

* The HONORABLE WILLIAM R. COLLINSON, Senior United States District Judge for the West-

ern District of Missouri, sitting by designation.

and consequently concede that in many, if not most, cases, areas that fall within the literal language of the Corps' "wetlands" definition will also fall within the Corps' section 404 permit jurisdiction. However, we do not believe that a determination of the Corps' jurisdiction can be made formalistically or in a vacuum without reference to the particular situation before us.

In the present case, for example, the facial appearance of the Slough falls within the Corps' definition of a wetland since the Slough as it presently exists is frequently inundated and saturated with surface water, and since the vegetation now found in the Slough consists almost exclusively of wetland-type vegetation. Despite the Slough's appearance, however, we conclude that the Slough is not a wetland as contemplated by Congress in passing the Clean Water Act. We reach this conclusion by focusing upon the peculiar facts and unique circumstances surrounding the Slough, its history, and its origin as a potential wetland.

II. Discussion

The Fort Pierre Slough is a privately owned area located within the City of Fort Pierre. Today, the Slough, which was originally a side-channel of the Missouri River, is essentially rectangular in shape and covers approximately 25 acres of land near to, although entirely separated from, the Missouri River. The Slough was first separated from the Missouri River in 1907, when a railroad bridge and approach were built across the northern (upstream) end of the Slough. The Slough's northern end was further separated from the Missouri River in 1927 and 1962 when highway bridges were constructed just below the original railroad bridge and approach.

Following its separation from the Missouri River in 1907, the Slough gradually dried and small trees and willows began to grow in the area. Over the course of approximately 60 years, the entire Slough area became a predominantly dry, thickly wooded river bottom, exhibiting none of the characteristics normally associated with a wetland-type ecological system. During this period, the residents of Fort Pierre used the Slough for a variety of beneficial activities. These activities included the raising of cattle, sheep, and hogs; the gathering of asparagus, mushrooms, and berries; the hunting and trapping of wildlife; and the cultivation of a fruit orchard. Any standing water found in the Slough during this period resulted only from heavy rains and resultant run-off, since no hydrological connection exists between the Slough and the Missouri River.

The essentially dry, river bottom characteristics of the Slough continued unchanged until 1968. In 1968, the Corps, in conjunction with routine river maintenance, dredged more than 50,000 cubic yards of sand from the Missouri River. This sand was pumped into the southern (downstream) end of the Slough. The Corps eventually filled an area of approximately 14 acres and pumped a total of 144,400 cubic yards of fill into the southern end of the Slough. These activities completely separated the southern end of the Slough from the Missouri River and prevented any surface water from flowing out of the Slough.

As a direct result of the Corps' dredging activities, surface water became trapped in the Slough. Over time, this water has become stagnant and polluted. As a result, virtually all of the Slough's trees have died, and since 1968, only cattails and other wetland-type vegetation have thrived in the stagnant and often polluted water covering the Slough. These dramatic changes have given the Slough the facial appearance of a wetland. Absent their own filling activities, the conditions relied upon by the Corps as a basis for their jurisdiction would not exist.

We do not believe the Corps' wetland jurisdiction extends to the Fort Pierre Slough. Here, prior to 1968, the Slough was not a wetland and exhibited none of the characteristics associated with a wetland. Further, any wetland characteristics

now exhibited by the Slough did not result from natural evolution and were not the intended or anticipated result of private or governmental activity. Rather, the Slough's wetland characteristics resulted entirely as the inadvertent, unintended by-product of the Corps' dredging activity. The Corps' purpose in filling the southern end of the Slough was the disposal of dredged material. The Corps did not intend and apparently never considered the effect their filling activity might have on the remainder of the Slough.

We do not believe the Clean Water Act authorizes the Corps to assert jurisdiction in a situation in which privately owned land, not otherwise within the Corps' jurisdiction, exhibits wetland characteristics only as an incidental result of unrelated river maintenance. To decide otherwise would allow the Corps to enlarge its jurisdiction beyond the scope originally intended by Congress. Further, to find the Slough as it now exists to be a wetland would be antithetical to the goals Congress sought to achieve in passing the Clean Water Act. Not only is the water in the Slough stagnant and polluted, but the Slough, which once provided the residents of the City with many benefits, is now devoid of wildlife, supports no fish or fowl, and is not conducive to recreation or other significant use by the public.

In holding that the Slough does not constitute a wetland, we do not decide whether Congress could assert jurisdiction over the Slough if it chose to do so. Further, our holding does not challenge the Corps' jurisdiction with regard to any other artificially created wetland-type environment. Rather, our holding is limited to the situation in which the Corps, as an unintended byproduct of ordinary river maintenance, inadvertently creates a wetland-type ecological system on private property where no such system previously existed. The decision of the district court finding the Slough to be a protected wetland under the Clean Water Act is reversed.