LESLIE SALT CO., a Delaware corporation, Plaintiff,

v.

The UNITED STATES of America; John O. Marsh, et al., Defendants.

UNITED STATES of America, Plaintiff,

v.

LESLIE SALT CO., a Delaware corporation, Cargill Inc., a Delaware corporation, Defendants.

Nos. C–85–8615–CAL, C–86–4187–CAL.

United States District Court, N.D. California.

Sept. 29, 1988.

As Amended Jan. 11, 1989.

Edgar B. Washburn, John P. Yeager, David M. Ivester, Ronald E. Altman, Washburn & Kemp, San Francisco, Cal., for Leslie Salt Co.

Francis B. Boone, Asst. U.S. Atty., San Francisco, Cal., for U.S., et al.

E. Clement Shute, Jr., Shute, Mihaly & Weinberger, San Francisco, Cal., for Save San Francisco Bay Ass'n and Nat. Audubon Society, defendants in intervention.

## OPINION

LEGGE, District Judge.

These cases were tried to the court, sitting without a jury. The cases were then argued and submitted for decision following the completion of briefing. The court has heard and reviewed the testimony of the witnesses, and has reviewed the designated deposition transcripts, the exhibits, the designated discovery responses, the record of the case, and the applicable authorities. This opinion constitutes the court's findings of fact and conclusions of law, as provided in Rule 52(a) of the Federal Rules of Civil Procedure.

### I. *Parties*

Leslie Salt Co., a Delaware corporation, is the plaintiff in C–85–8615 and a defendant in C–86–4187. Cargill Inc., a Delaware corporation, is the owner of Leslie Salt Co. and is also a defendant in C–86–4187. Those parties will jointly be called "Leslie" in this opinion. The United States of America is the plaintiff in C–86–4187 and the defendant in C–85–8615. The Secretary of the Army, the United States Army Corps of Engineers, and certain officers of the Corps of Engineers are also defendants in C–85–8615. The United States, the Secretary, the Corps and its officers are collectively called the "Corps." The Save San Francisco Bay Association, Inc., and the National Audubon Society were granted leave to intervene as defendants in C–85–8615.

### II. *Jurisdiction of the Court*

There is no dispute between the parties as to the jurisdiction and venue of this court. Jurisdiction is predicated on 28 U.S.C. §§ 1331, 1345, 1346, and 2201–2202, 33 U.S.C. §§ 406 and 1319(b). The property in dispute is located in this district, and venue is proper under 28 U.S.C. §§ 1391(b), 1391(e) and 1402, and 33 U.S.C. § 406 and 1319(b).

These actions arose when the Corps issued a cease and desist order to Leslie pertaining to Leslie's activity on certain property that Leslie owns in the City of Newark, California. The Corps asserted jurisdiction over the property under § 1344 of the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, and subsequently also asserted jurisdiction under § 403 of the Rivers and Harbors Act, 33 U.S.C. § 401 *et seq.* Leslie filed action C–85–8615 to contest the Corps' jurisdiction over the property. The Corps then brought action C–86–4187 to establish its jurisdiction over the property under those two Acts, and claimed that Leslie had violated those Acts in connection with its activities on or connected with the property. The principal, but not the only, question to be resolved is whether the property is a "wetland" within the meaning of the applicable statutes and regulations, and hence is under the jurisdiction of the Corps.

### III. *Burden of Proof*

Before trial the Corps moved for a bifurcation and stay of the action. The motion in essence asked this court to refer the central issue in this case—whether the property is under the jurisdiction of the Corps—to the Corps for its administrative decision. That decision would have then been reviewable by this court under the Administrative Procedure Act, 5 U.S.C. § 706. The record for that review would have been confined to the Corps' decision and its administrative record, and the review would have been under the limited

standard of whether the Corps' decision was arbitrary, capricious, an abuse of discretion, or contrary to law. This court denied that motion and determined that the issues should be tried as plenary actions in this court. *Leslie Salt Co. v. United States,* 660 F.Supp. 183 (N.D.Cal.1987).

At trial, the Corps acknowledged that the burden of proof in this plenary civil trial is the preponderance of the evidence. However, the parties disagree about what must be proved. Leslie contends that it has the burden of showing that the Corps lacks jurisdiction over its property. The Corps contends that Leslie must prove that the Corps' assertion of jurisdiction is arbitrary and capricious.

The basis for the Corps' argument is the well-settled principle that an agency's interpretation of a statute which it administers is generally entitled to substantial deference, as is the agency's interpretation of its own regulations. *Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 566, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1980). Under this principle, the court must accept the agency's interpretation so long as it is "reasonable and not in conflict with the expressed intent of Congress." *United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 131, 106 S.Ct. 455, 461, 88 L.Ed.2d 419 (1985).

The court cannot determine whether the Corps has jurisdiction over Leslie's property with no reference at all to the Corps' interpretation of the applicable statutes and regulations. However, the Corps' interpretation is not entitled to prevail simply because it is not capricious or arbitrary. The issue is whether it "is *reasonable,* in light of the language, policies, and legislative history of the Act[s] for the Corps to exercise jurisdiction." *Id.* at 131, 106 S.Ct. at 461 (emphasis added).

The standard of reasonableness requires evaluating the evidence in light of the language of the Clean Water Act, the Rivers and Harbors Act, and the applicable regulations under those Acts. That requires consideration of a number of factors, including the degree of the Corps' scientific or technical expertise necessarily drawn upon in reaching its interpretation, the consistency of the interpretation within the Corps, the length of adherence to the interpretation, and the explicitness of the Congressional

grant of authority to the Corps. *See Avoyelles Sportsmen's League v. Marsh,* 715 F.2d 897, 910–11 (5th Cir.1983).[1]

This is the standard which this court has followed in this case. The court emphasizes that this reasonableness standard does not affect the parties' evidentiary burdens in proving disputed factual issues. Deference does not require the court to accept the Corps' version of the evidence. And the facts stated in this opinion are found by this court to be facts by a preponderance of the evidence.

### IV. *The Role of the Court*

Underlying the legal and factual issues to be decided in this case is the financial question of what use will be made of the property. It is obviously a valuable piece of commercial property, and Leslie seeks to develop it. By asserting jurisdiction, the Corps seeks to preclude or restrict that development, and in essence to maintain the property in its present undeveloped state.

This case therefore involves a balance between the rights of private property on the one hand, and the interests of the government and the public on the other. The scale for measuring that balance is defined by Congress in the Clean Water Act and the Rivers and Harbors Act.

The role of this court is not to sit as a super-ecologist. That is, it is not the function of this court to decide what *should* be done with the property in the best interests of ecological balance. If that were the court's function, this court would probably say that the San Francisco Bay Area has too much development and that more land should be left undeveloped. But that is not the court's function. This court's role is to define what Congress did under the Acts, to define what powers the Corps has been given by Congress and by the regulations, and to apply those definitions to the evidence which the court has heard about the property. In order to restrict or prevent Leslie's right to develop its property, the court must find from the evidence that the property is within the jurisdiction of the Corps under those Acts and regulations. That is the extent of the judicial power in this dispute.

1. If the court determines that the Corps has jurisdiction, certain decisions would then be made by the Corps under its administrative processes.

## V. *The Property*

The property is owned by Leslie. It totals one hundred fifty-three acres, divided by a road into two parcels of approximately one hundred forty-three acres and ten acres. Except where there is a reason to distinguish between them, both parcels will be collectively called the "property."

The property is located in the City of Newark, Alameda County, California. It is surrounded on all sides by roads and highways. The one hundred forty-three acre parcel ("parcel 143") is bounded on the north by State Highway 84, on the west by Thornton Avenue, on the south by relocated Jarvis Avenue, and on the east by Jarvis Avenue, with residential subdivisions of the City of Newark lying east across Jarvis Avenue. The ten acre parcel ("parcel 10") is located across relocated Jarvis Avenue to the south of parcel 143 and is bounded by Thornton and Jarvis Avenues.

Across Thornton Avenue to the west of the property is the San Francisco National Wildlife Refuge, situated on land which was previously taken from Leslie by condemnation action of United States. The nearest navigable water is Newark Slough, which is approximately one quarter mile from the southernmost tip of the property, and that point is approximately two miles from San Francisco Bay.

Parcel 143 consists of areas of differing characteristics which are important for purposes of this litigation. Approximately the eastern one-third of the parcel is pastureland. Located on the pastureland are two pits, which were formerly used by Leslie for the deposit of calcium chloride. The remaining two thirds of parcel 143 constitutes land surface which Leslie previously used as crystallizers for the manufacture of salt. The parcel has also been impacted by the construction of highways, a sewer line and ditches, and by plowing, as discussed below. There are no tributary streams or rivers either on or adjacent to the property. The property has never been inundated by tides. The property is drained of water, and is subject to some backflow, through three culverts which run under Thornton Avenue. One is located at the southernmost tip of parcel 10, and runs under Thornton Avenue to Newark Slough.

The second is located near the intersection of Jarvis and Thornton, and runs under Thornton Avenue onto the wildlife refuge. The third is located approximately halfway up Thornton Avenue, and also runs under Thornton Avenue and onto the wildlife refuge.[2]

For purposes of this case, the condition of the property must also include consideration of weather. The San Francisco Bay Area has what is called a Mediterranean climate. That is, rain is not consistent throughout the year, but occurs primarily in the winter months with little or no rainfall during the balance of the year. Since the climate is wet in one season and dry the remainder of the year, the amount of water on the property will vary over the year. As a result, observations and scientific tests on the "wetness" of the land will depend in part on when the observations and tests are made.

## VI. *History of the Property*

The issue in this case is whether the property *is* subject to Corps' jurisdiction. That decision must be made by examining the characteristics of the property as it now is (or more accurately, as it was in 1985 when the Corps asserted jurisdiction) under the definitions of the Acts and the regulations. The inquiry is not the condition of the property at some prior time in its history. Nevertheless, some references to the history of the property are appropriate as being probative of its conditions today. Indeed, even the Corps argues that the formation of the soils in the geological history of the property is relevant to a determination of whether those soils are "hydric" today. The court will therefore briefly discuss the history of the property insofar as its general background is probative of the present condition of the property.

The property was originally acquired by Leslie's predecessors in interest in the late 1800s. A certain portion of the property, primarily the eastern one-third of parcel 143, has been used as pasture and grazing land for livestock since that time. In approximately 1919, Leslie's immediate predecessor in interest began to construct facilities on the property for the manufacture of salt. A railroad spur, a salt refining plant

---

**2.** This property is not of the same type or location as that discussed in *Leslie Salt Co. v. Froehlke,* 578 F.2d 742 (9th Cir.1978). The property in that case was, in its natural condition, marshland subject to the ebb and flow of the tide. The present property is not marshland. *Id.* at 745.

and related buildings were erected. Pits were excavated on the eastern one-third of the property for depositing calcium chloride.

The western two-thirds of the property was made into so-called salt crystallizers, which held salt brine during the final stage of the solar salt production process. The crystallizers were constructed on dry land, by excavating large shallow basins, and leveling and compacting the soil on the bottom to create a level and watertight surface. The excavated soil was used to build earthen levees around the crystallizers to form watertight earthen containers. During the years of their use by Leslie, saturated salt brine (which had been produced by Leslie's evaporation ponds located closer to San Francisco Bay) was pumped through the Coyote Hills and into the crystallizers. The salt then precipitated and settled onto the bottom of the crystallizers. The remaining liquid was drawn off, and the salt was harvested by large mechanical harvesters that ran across the floor of the crystallizers. The salt was then moved by railcars to a refining plant located on the property. After each harvest of the salt, the crystallizers were drained, releveled, and recompacted.

By 1959 the use of the property to manufacture salt became uneconomical. Since 1959 (with the exception of some limited production in 1962 and 1968), no use was made of the crystallizers, and that portion of the property has remained dry, except when rainwater accumulates during the winter. Ponds temporarily form after rains, because the floor of the crystallizers has remained relatively watertight as a result of their construction and frequent compaction. Before being plowed in 1983, the crystallizers were generally devoid of any vegetation, due to the compaction and the high salinity of the soil resulting from their prior use in the manufacture of salt.

A dust problem resulted from the dry and barren condition of the crystallizers. Dust blew from their surface onto the neighboring housing tracts across Jarvis road. As a result, Leslie was cited for air pollution violations. In an attempt to control the dust problem, Leslie plowed the property in 1983 and 1985. The plowing had the obvious result of loosening the soil in the crystallizers and creating furrows. That loosening of the soil and creation of furrows resulted in conditions somewhat more hospitable to the growth of plants.

Two other acts of man affect the present character of the property. In the early 1980s, the Eastbay Dischargers Authority constructed a large sewer line across the property. The construction had the effect of disturbing the natural conditions and left fill and inundations on the property. Between 1980 and 1983, Caltrans constructed Highway 84 across the northern part of the property; relocated Thornton Avenue across the western portion of the property; and relocated Jarvis Avenue, dividing the property into the two parcels. These construction activities by Caltrans resulted in the creation of highways, roadbeds, ditches, and drainage facilities, including culverts under Thornton Avenue. The Caltrans construction also breached a levy on the wildlife refuge and destroyed an inflow control that had prevented Newark Slough from flooding the refuge area. The Caltrans construction was also apparently responsible for the destruction, or the keeping open, of what had been a tidegate on one of the culverts under Thornton Avenue. Leslie has asked Caltrans to put a floodgate on one of the culverts, but Caltrans has declined because of the controversy over the issues in this case.

That is the present condition of the property. For purposes of this discussion and the Corps' claim of jurisdiction, the property can be discussed by reference to the following segments: (a) the western two-thirds of parcel 143, which is the former crystallizer area; (b) the eastern one-third of parcel 143, which has primarily been pastureland; (c) the calcium chloride pits dug on that eastern one-third; (d) parcel 10; and (e) the physical characteristics created by the Caltrans and the sewer construction.

What significance is to be given to the fact that certain of the present features were man-made? The Corps takes the position that this fact should be ignored. Leslie argues that the court should not consider the impact of changes that were made to the property by others without Leslie's consent.

The significant man-made changes to the property include the construction by Caltrans discussed above. In addition, the United States extended some of the drain-

age ditches across the wildlife refuge to Newark Slough, for the purpose of carrying tidewater onto the refuge in order to create a wetland environment there. Despite requests from Leslie, neither the United States nor Caltrans has installed effective tide control mechanisms on the culverts or ditches, with the result that some water occasionally reaches the edges of Leslie's property in the culverts and ditches. Leslie has attempted to install floodgates on the ditches, but these mechanisms were either opened or removed by others.

■ The court agrees generally with the Corps that the impact of human activity is not, in the usual case, relevant to the Corps' jurisdiction under the Clean Water Act. If a water body is a "water of the United States," it does not matter how it came to be so. See, e.g., United States v. Akers, 651 F.Supp. 320, 322 (E.D.Cal.1987); Track 12, Inc. v. District Engineer, 618 F.Supp. 448, 450 (D.Minn.1985).

The situation in this case, however, is not typical. The reported decisions on the significance of man-made alterations have involved properties that were indisputably "wetlands," or were otherwise "waters of the United States." In addition, those cases did not involve acts of man that were taken without the consent of, and over the protest of, the owner of the property.

In this case, the Corps flooded the wildlife refuge and thereby brought tidewater further inland, reaching the edges of Leslie's property. Moreover, the Corps and Caltrans have refused to install tide control mechanisms that would prevent water from reaching the property, and the Corps has prevented Leslie from maintaining such devices. The Corps has in essence tried to expand its own jurisdiction by creating some wetland conditions where none existed before.

Such actions by a government agency undermine the balance struck by Congress between regulation and private ownership. This court therefore concludes that the impact of backflow of water over the wildlife refuge and through the culverts and Caltrans drainage ditches should not be considered in determining the Corps' jurisdiction.

This conclusion is consistent with United States v. City of Fort Pierre, 747 F.2d 464 (8th Cir.1984). In that case, a dry slough bed began to exhibit wetland characteristics as a result of the Corps' dredging activity on a nearby river. The court held that the effects of the acts of the Corps should be disregarded in determining Clean Water Act jurisdiction, because "[t]o decide otherwise would allow the Corps to enlarge its jurisdiction beyond the scope originally intended by Congress." Id. at 467. This court believes that this principle applies in this case.

The government's reliance on Swanson v. United States, 789 F.2d 1368 (9th Cir. 1986) in this case is misplaced. In Swanson, the court held that when the Corps constructed a new dam, its jurisdiction was correspondingly extended to the new high water mark. However, in that case, Congress explicitly approved the dam construction. In this case, Congress did not approve the creation of wetland conditions on Leslie's property. The government argues that Congressional approval of the construction of the wildlife refuge authorizes an expansion of Corps jurisdiction over Leslie's property. However, Congressional approval of a project does not amount to a sanction for all consequences of the project, only those that are part of it. Congress approved a wildlife refuge of a certain dimension; it did not approve a wildlife refuge that was self-expanding. Swanson does not stand for the proposition that an agency can expand its own jurisdiction; it merely reinforces the truism that Congress may give, and Congress may take away, the regulatory jurisdiction of agencies.

## VII. The Corps' Assertion of Jurisdiction

The events which led the Corps to assert jurisdiction over the property occurred in October 1985. Leslie began digging a feeder ditch and siltation pond on a portion of the former crystallizers. When the Corps became aware of this, a representative of the Corps visited the property and conferred with Leslie. The Corps then issued a telegraphic cease and desist order, and later a letter asserting jurisdiction.

A second event occurred in 1986–87 with respect to parcel 10. Leslie plugged one end of the culvert leading from that parcel to Newark Slough, in order to prevent water from backing up through the culvert and onto the parcel. The Corps objected to that activity and issued a cease and desist order.

Although Leslie contests the Corps' jurisdiction to issue those cease and desist orders, Leslie has not taken any steps in violation of them while this litigation has been pending.

The Corps asserts jurisdiction over the vast majority of the property, under numerous subsections of the Acts and regulations; *see* exhibit 639. The actual extent of its claim of jurisdiction is marked on a map which is exhibit 640. Leslie denies that any of its property is subject to Corps jurisdiction. It admits that certain small portions in the southernmost tip of parcel 10 and in the southwest corner of parcel 143 may exhibit wetland conditions at certain times of the year, and that water occasionally backs up through the culverts and into the Caltrans ditches. However, as stated above, Leslie contends that those conditions should not be considered for purposes of this case, because they resulted from activities of the United States and Caltrans to which Leslie did not consent.

### VIII. *Rivers and Harbors Act*

■ Has Leslie violated § 403 of the Rivers and Harbors Act, 33 U.S.C. § 401, *et seq.* That issue first of all depends upon whether Leslie's property is subject to the jurisdiction of that Act.

Section 403 in essence prohibits the "creation of any obstruction ... to the navigable capacity of any of the waters of the United States," and the alteration of the condition or capacity of any "navigable water of the United States." A general definition of the term "navigable waters of the United States" is set forth in 33 C.F.R. § 329.4. And the extent of Corps' jurisdiction under the Act and the regulation has been interpreted in *Leslie Salt Co. v. Froehlke*, 578 F.2d 742 (9th Cir.1978). As interpreted by the Ninth Circuit, the Corps' jurisdiction under that Act extends only to the portions of property that are "covered by the ebb and flow of the tide to the mean high water mark ... in its unobstructed, natural state." *Id.* at 753.

**3.** 33 C.F.R. § 329.8(a) should not apply when the artificial condition was created against the

The evidence established, and the Corps concedes, that none of Leslie's property is below the mean high water line, except certain elevations in the culverts under Thornton Avenue and in certain low-level portions of the drainage ditches constructed by Caltrans. However, the court has concluded for the reasons discussed above that the impact of these structures should not be considered in determining the extent of the Corps' jurisdiction over Leslie's property.[3] The court also finds that even if the culverts and ditches were considered, the evidence is not sufficient to establish that Leslie's property is subject to the jurisdiction of the Act as defined in *Leslie v. Froehlke*, above. Therefore, the court finds and concludes that the acts of Leslie did not violate the Rivers and Harbors Act.

### IX. *Clean Water Act*

■ Congress passed what is now called the Clean Water Act in 1972, and has subsequently made several amendments. 33 U.S.C. § 1251, *et seq.* Congress did so acting under its Commerce Clause powers. It stated that its legislative objective was "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Congress' concerns in the Act were obviously with pollution of the nation's *waters*, and not with all forms of pollution throughout the United States.

Under the Act, certain activities are prohibited or limited. Among those is "the discharge of any pollutant." 33 U.S.C. § 1311. And Congress defined "pollutant" to include the dumping of fill. 33 U.S.C. § 1362(6).

The primary section with which we are concerned in this case is section 404 of the Clean Water Act, 33 U.S.C. § 1344. In subsection (a), Congress gave to the Corps the power to issue permits, and necessarily to deny permits, for the "discharge of dredged or fill material into the navigable waters." Congress defined the term "navigable waters" to mean the "waters of the United States." 33 U.S.C. § 1362(7). Con-

owner's consent.

gress did not define the term "waters of the United States."

Congress therefore gave the Corps jurisdiction to regulate the discharge of fill into the "waters of the United States." This circuit has said that the jurisdictional terms of the Act are to be given the broadest possible interpretation under the Commerce Clause of the constitution. *Leslie Salt Co. v. Froehlke,* 578 F.2d at 755. However, the Ninth Circuit has not defined the maximum limits of the Corps' jurisdiction under the Act. *Id.* at 756. And it is obvious from the statute and the definitions of Congress that the Corps' jurisdiction does not extend to dry land; it extends only to that which is properly "waters of the United States."

As stated, neither Congress nor the courts have defined the term "waters of the United States." The Corps has defined that term in its regulations. 33 C.F.R. § 328. The regulation states that its purpose is to define "the term 'waters of the United States' as it applies to the jurisdictional limits of the authority of the Corps of Engineers under the Clean Water Act." 33 C.F.R. § 328.1.[4]

The primary subsection with which we are concerned here is § 328.3, which defines the terms used to describe property subject to the jurisdiction of the Corps. It is necessary to study some of this language in detail, and the applicable portions of the regulations are set out below.[5]

The decisions to be made with respect to the regulations in this case are primarily ones of fact. That is, giving the Act and the regulations the broad interpretation defined by the U.S. Supreme Court and the Ninth circuit, does the evidence establish that the property is or is not within the definition of "waters of the United States?"

Before discussing the evidence and the language, the court notes that there are two conditions that clearly do not invoke the Corps' jurisdiction. First, land does not become a water of the United States just because water collects, ponds, and stands on land for a few days after a rain. Any land subjected to enough temporary rainfall will collect water which stands until it runs off or percolates into the ground. Such temporary collection of rain does not convert the land to a water. Second, land

---

**4.** Other regulations of the Corps, including the regulations dealing with the issuance of permits if the Corps has jurisdiction, are contained in 33 C.F.R. §§ 320–330.

**5.** § 328.3 Definitions.
    (a) The term "waters of the United States" means
    (1) All waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide;
    . . . .
    (3) All other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect interstate or foreign commerce including any such waters:
    (i) Which are or could be used by interstate or foreign travelers for recreational or other purposes;
    (ii) From which fish or shellfish are or could be taken and sold in interstate or foreign commerce; or
    (iii) Which are used or could be used for industrial purpose by industries in interstate commerce;
    . . . .

    (7) Wetlands adjacent to waters (other than waters that are themselves wetlands) identified in paragraphs (a)(1) through (6) of this section. . . .
    (b) The term "wetlands" means those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs, and similar areas.
    (c) The term "adjacent" means bordering, contiguous, or neighboring. Wetlands separated from other waters of the United States by man-made dikes or barriers, natural river berms, beach dunes and the like are "adjacent wetlands."
    . . . .
    (f) The term "tidal waters" means those waters that rise and fall in a predictable and measurable rhythm or cycle due to the gravitational pulls of the moon and sun. Tidal waters end where the rise and fall of the water surface can no longer be practically measured in a predictable rhythm due to masking by hydrologic, wind, or other effects.

484

does not become a water of the United States simply because water drains off of the land and ultimately—through ditches, culverts, rivers, sewers, or the like—flows into waters of the United States. If such drainage made land "waters of the United States," then all property located on elevations, no matter how high, above a water of the United States would become "waters of the United States." But drainage off of land is not enough to make it a water of the United States. Not until flowing water becomes a "tributary" is it deemed to be a water of the United States, 33 C.F.R. § 328.3(a)(5), and the Corps does not contend here that the water that drains from Leslie's land is a tributary.

The court turns now to an examination of the evidence and the portions of 33 C.F.R. § 328.3 under which the Corps claims that Leslie's property is a water of the United States.

A. The Ebb and Flow of the Tide

The first is § 328.3(a)(1). That includes "all waters which are subject to the ebb and flow of the tide." 33 C.F.R. § 328.4(b) provides that the tidal waters of the United States extend to the high tide line. The same term is used in section 328.3(d).

It is clear from the evidence that virtually all of Leslie's land lies above the high tide line. The property has never been inundated by tides. The only portions that are subject to any ebb and flow of the tide are low elevations in the ditches constructed by Caltrans, and certain small portions at the southernmost tip of the parcel 10 and the southwestern tip of parcel 143. That water gets there by backing up through one of the culverts running from the wildlife refuge under Thornton Avenue.

The Corps concedes that its jurisdiction does not cover drainage ditches that are dug on dry land. Regulation section 328.-3(f) defines tidal waters as those that "rise and fall in a predictable and measurable rhythm." The tidal waters end "where the rise and fall of the water surface can no longer be practically measured." Id. The court finds and concludes that the water that does reach Leslie's land is not tidal water. The water comes from the bay, approximately two miles up Newark Slough, over the lands flooded by the United States for the wildlife refuge, and through culverts. The testimony of the government's witness that there might actually be tidal flow onto Leslie's property was not supported by sufficient objective data. And the court finds that any tidal impact cannot be practically measured.

As stated above, the court also believes that the principle stated in *City of Fort Pierre*, 747 F.2d at 467, is applicable here. That is, it is primarily the flooded condition of the wildlife refuge across Thornton Avenue from Leslie's property that results in the flow of water through the culverts under the road. The evidence is clear that the property was not impacted by any inundation until the construction of the culverts. And since the United States created that condition by the flooding and maintenance of the wildlife refuge, it cannot assert jurisdiction as a result of its maintenance of that causal condition.

The court finds and concludes by a preponderance of the evidence that the property is above the high tide line and is not "subject to the ebb and flow of the tide."

B. Isolated Waters or Wetlands

The second subsection under which the Corps asserts that a portion of Leslie's property is a water of the United States is § 328.3(a)(3):

(3) All other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect interstate or foreign commerce including any such waters:

(i) Which are or could be used by interstate or foreign travelers for recreational or other purposes; or

(ii) From which fish or shellfish are or could be taken and sold in interstate or foreign commerce; or

(iii) Which are used or could be used for industrial purpose by industries in interstate commerce;

This subsection has come to be called the "isolated" wetlands or waters provision. The general thrust of this subsection is that certain waters or wetlands may be waters of the United States even though they are physically unconnected with other waters of the United States. The jurisdictional nexus for including such isolated waters within federal jurisdiction is stated in the three subsections of (a)(3); that is, some connection with interstate travel or commerce.

To establish that interstate connection here, the Corps relies upon comments made about § 328.3(a)(3) in the Federal Register where the Corps issued the final regulations. 51 Fed.Reg. 41,206, 41,217 (Nov. 13, 1986). The comments state that the Corps adopts the definitions of the Environmental Protection Agency,[6] which includes consideration of the use of the property as habitat by migratory birds and endangered species. There was evidence at trial that the property is occasionally used by migratory birds, and one endangered species of mouse was found at one location on the property. The Corps' witnesses would extend that jurisdiction not only to *actual* use by migratory birds, but also to *potential* use. Leslie contends that Congress did not intend migratory birds or endangered species to be "interstate commerce" under the Clean Water Act, and that even if it did, such an extension of jurisdiction would not be constitutionally permissible.[7] However, this court need not reach those questions.

Before the interstate commerce connections are considered under the three subsections of (a)(3), the property must itself be "other waters" as described in section (a)(3). The Corps contends that the portions of the Leslie property which are such "other waters" are the calcium chloride pits and the former crystallizers during such periods as rainwater collects in them. The listing of "other waters" in section

(a)(3) includes "lakes, rivers, streams ... mud flats, sand flats ... sloughs, prairie potholes, wet meadows, palaya lakes, or natural ponds.[8]" Giving those terms their common sense meanings, the court finds that neither the crystallizers nor the calcium chloride pits are "other waters."

Even if the phrase "such as" in front of those terms is interpreted, as it should be, to mean that the list is not exclusive, the definition of "other waters" is still limited to items of the same kind or class as those listed. *See Weyerhaeuser Steamship Co. v. United States*, 372 U.S. 597, 600–01, 83 S.Ct. 926, 928–29, 10 L.Ed.2d 1 (1963); 2A *Sutherland Statutory Construction* § 47.17 at 103 (4th ed. 1973). The items listed are all natural water conditions, and not artificially created structures.

The calcium chloride pits and former crystallizers were dug for use in manufacturing salt. They are not natural water conditions and are in fact dry most of the year. Even if the regulation is interpreted as extending the definition to include artificially created water bodies, the mere ponding of water on otherwise dry land is not enough to convert that land into "other waters."

This conclusion finds support in the Corps' statements concerning the regulations. The comments to the final regulations promulgated in 1986 state, "For clarification it should be noted that we do not consider the following waters to be 'Waters of the United States.' ... Artificial lakes or ponds created by excavating and/or diking dry land to collect and retain water and which are used exclusively for such purposes as stock watering, irrigation, settling basins, or rice growing." 51 Fed.Reg. 41,-206, 41,217 (Nov. 13, 1986). The calcium chloride pits and former crystallizers are types of settling basins, and would not, under these comments, be considered "waters of the United States" even if they

---

6. And the Environmental Protection Agency's general counsel opinion of November 19, 1985.

7. The U.S. Supreme Court, in *Riverside Bayview Homes,* 474 U.S. at 131 n. 8, 106 S.Ct. at 462 n. 8, expressly declined to rule on isolated wetlands issues.

8. The definition also includes "wetlands," which the court will discuss below under that specific provision of the regulation.

were still operating and holding quantities of brine. The same conclusion is apparent when, as in recent years, water is no longer being pumped onto the property.

The court therefore finds and concludes that Leslie's properties are not "other waters" under 33 C.F.R. § 328.3(a)(3).

## C. Wetlands

The Corps contends that virtually all of Leslie's property is a "water of the United States" because it is a "wetland." The Corps' jurisdiction over wetlands is contained in 33 C.F.R. § 328.3(a)(7): "Wetlands adjacent to waters...." The term "wetlands" is defined in section 328.3(b) as

those areas that are inundated or saturated by surface or groundwater at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs, and similar areas.

Most of the evidence at trial focused upon whether Leslie's property meets that definition. Both sides generally agreed that in making that decision, three primary indicators must be examined: (1) the water on the property ("hydrology"), (2) the condition of the soils, and (3) the extent and nature of the plant life. Those evaluations are made more difficult by the fact that the climate has distinct rainy and dry seasons, and the observations will vary depending upon when the indicators are examined.

The various and interrelated subportions of the definition of "wetland" in section 328.3(b), and the evidence pertaining to them, will be discussed below. However, by first looking at that definition as a whole, it is apparent that the primary indicator is the vegetation. That is, the land must be sufficiently wet for a sufficient duration to support a prevalence of vegetation which is typically adapted for life in saturated soils. Bare land does not meet the definition. And vegetation does not do so unless there is a prevalence of vegetation typically adapted for life in saturated soils.[9]

The first part of the definition requires that the area be "inundated or saturated."[10] It was clear from the testimony that the property as a whole is not inundated or saturated by any tidal or "wash" action. The source of inundation and saturation of this property, if there is any, can only be rain. It was also clear that the property could be called "inundated" only during and for a short time immediately after winter rains.

The term "saturated" is not defined by the statute or the regulations. But the witnesses appeared to agree on its definition; that is, containing water to a point where the soil can hold no more water and oxygen in the soil is shut out.

Experts on both sides conducted extensive tests of the hydrology and of the soils to make a determination as to whether the property is inundated or saturated. Various tests were used in an attempt to measure the hydrology and degree of saturation. The results of each of those tests, and the specific methods and measures used by the experts, need not be discussed in detail. In general, the studies included analyzing the type of soil, the amount of oxygen in the soil, the amount of water in the soil, the color of the soil, and the amount of reduction of other chemicals.

Water has to be present in the vegetation root zone (by whatever number of inches the depth of that zone is measured) in order for the area to be a wetland. The root zone of this property reaches levels of saturation only during the rainy season. After the runoff of each rain, the root zone is not saturated. Those conclusions are true as to the property as a whole. They

---

**9.** Some comment is appropriate regarding the term "vegetation." The testimony demonstrated that at certain times of the year algae or alginates form on certain areas of the property. However, the witnesses were unanimous in their conclusion that algae is not "vegetation." That term requires a morphological type of structure. And further, algae can form in a wet condition in a matter of a few days.

**10.** It makes no difference in this definition whether the inundation or saturation is by surface water or by ground water.

are also true as to the crystallizers, whether examined before their plowing or after, except that plowing did increase the temporary puddling of rainwater. The Corps' evidence did not establish the existence of saturation in the root zone area.

The Corps also contends that certain soils on the property are "hydric" by reason of their geological definition. That is, geologists use that term in describing certain types of soil. But that definition generally pertained to soils in layers well below the root zone, and to the wetness conditions when those layers were laid down in long-past geological history. Use of the term "hydric soils" does not really assist in a determination of whether the root zone soil meets the requirements of the regulation.

The Corps also argues for application of the principle of capillary rise; that is, water rises by capillary action from the water table up into higher layers of the soils. The court is prepared to accept this principle of physics. But the evidence was that even capillary rise did not necessarily reach the soils in the root zone. And indeed, even areas affected by capillary rise do not necessarily reach a saturated condition.

The court finds from weighing and evaluating all of the evidence, both percipient and expert, that the property is not "inundated or saturated."

After a rain that is heavy or long enough, any soil will become temporarily saturated. But that is not enough for a determination of wetland under the regulations. The regulations goes on to state that the saturation must be "at a frequency and duration" sufficient to support a prevalence of vegetation typically adapted for life in saturated soil conditions. 33 C.F.R. § 328.3(b). The court finds from an evaluation of the evidence that there is not such a frequency or duration. As stated, it is simply not enough that rain water collect on property for a few days for that property to become a water of the United States.

The next requirement under regulation 328.3(b) is that the inundation or saturation be sufficient to support, and "under normal circumstances" does support, relevant types of vegetation. The U.S. Supreme Court has noted that this excludes upland areas that for some aberrational reason have some wetland-type vegetation. *Riverside Bayview Homes*, 474 U.S. at 130 n. 7, 106 S.Ct. at 461 n. 7. The Corps acknowledges that its jurisdiction should not extend to "abnormal" conditions, but should pertain to truly aquatic areas; see exhibits 205, 209, 574. The evidence of the "normal circumstances" of the property again focused on the hydrology, the soils, and the vegetation. The evidence included both the present condition of the property and some recent history. And again, the finding of "normal circumstances" is made difficult by the seasonal nature of the rainfall.

It is clear that the eastern one-third of the property, both historically and under present conditions, has been pastureland supporting primarily upland and not wetland vegetation. The area of the crystallizers was not able to support much vegetation of any type, because it had been highly compacted and because its use in the manufacture of salt resulted in very saline soil. This condition was changed somewhat by the plowing of the crystallizers, which made them more hospitable to plant life. However, even since then the plant life has been sparse and has been limited in duration to the rainy season. It is unclear whether the Corps considers the "normal circumstances" to be before or after the plowing. But in either event, the court finds that the salt crystallizer area could not support the relevant types of vegetation under normal circumstances.

Some areas of the crystallizers have been disturbed by the Caltrans construction and by the construction of the sewer line, leaving those areas in an altered condition. The court is willing, as urged by the Corps, to consider those present conditions as "normal" circumstances. Even so considered, the evidence compels the conclusion that during the vast majority of the year there is little or no vegetation on the crystallizer area.

Two areas in the southern corner of parcel 10 and in the southwest corner parcel 143, as well as some of the Caltrans ditch-

es, do support vegetation of the relevant type. But circumstances in those areas are not "normal," because the ability to support vegetation was caused primarily by the government's flooding of the wildlife refuge across Thornton Avenue. And those conditions in those very small areas, even if accepted as normal, are not reflective of the normal circumstances of the property as a whole.

The next requirement under regulation 328.3(b) is that the property support a "prevalence of vegetation ..." There is a difference between the parties as to what the term "prevalence of vegetation" means. Leslie interprets the requirement to mean that in looking at the condition of the ground as a whole, there must be a prevalence of vegetation. On the other hand, the Corps interprets the phrase to mean that if there is *any* vegetation on the land, all that is required is that the prevailing vegetation be of a type which is adapted for life in saturated soil conditions. This court believes that the Corps' interpretation is not reasonable. First, the Corps' position would compel the conclusion that if there were only *one* plant on a large parcel of ground, but if that one plant were adapted for life in saturated soil, then the entire parcel must be a wetland. That position defies the common sense meaning of the word "wetland." Second, the Corps' interpretation is contrary to its own guidance manual on making wetland determinations. The manual requires that *before* determining the issue of the type of vegetation, a finding must first be made that vegetation is the predominate condition of the property. Indeed, in other areas of the United States the Corps does not agree with the interpretation being advanced as to "prevalence of vegetation" in this case. Finally, the Corps' interpretation appears contrary to the definition of wetland in section 328.- 3(b) read as a whole. When all the subclauses of 328.3(b) are read together, it is clear that the predominate condition of the land must be vegetation, and that the vegetation must be plants that can live in saturated soil conditions.

Leslie contends that the prevalence requirement means that fifty per cent or more of the site has to be covered by vegetation. This court need not set any exact percentage requirement for prevalence, since it is clear from the evidence in this case that the prevalence requirement has not been met under any reasonable standard regarding the questioned portions of the property.

The court finds from the evidence that the salt crystallizer areas have not and do not support a prevalence of vegetation. This finding is based upon the testimony describing the property, the historical condition of the property leading up to the "normal" conditions of today, aerial photographs taken over a period of years, and the fields notes and reports of the experts who examined the area.[11] There was no plant growth in the calcium chloride pits. With respect to the crystallizers, it is clear even from the Corps' evidence that no plant life exists in some areas, and in other areas plants cover only up to one per cent of the ground. And many of the plant types identified by the Corps live only during the immediate rainy season and die shortly thereafter. The Corps' witnesses nevertheless testified that those plants were adapted for an annual life cycle that includes dormancy during long dry periods. However, this court questions whether plants that are dead for as much as nine months of the year can meet a "prevalence of vegetation" requirement.

The final clause in the definition of "wetland" requires that the prevalent vegetation be of a type "typically adapted for life in saturated soil conditions." Botanists divide plants into roughly five categories for purposes of determining such adaptation. Those categories define the likelihood of a particular plant being found in saturated soil conditions. They range from those which are found in saturated conditions ninety-nine percent of the time, to those

11. At the time of the construction of the freeway, the U.S. Fish & Wildlife Department urged that the highway interchange be put where it is, in the middle of the former crystallizers, because that location for the interchange was one of very low environmental impact.

which are not listed and hence are rarely if ever found in saturated soil conditions. Whether a specific plant falls into a particular category may depend upon who is preparing the list. But there is a high degree of consistency in most of the lists.

The court heard extensive evidence on the types of plants found on the property and the nature and characteristics of those plants. On the eastern one-third of the property, the prevalent vegetation is upland grasses which are typically not adapted for life in saturated soil conditions. A few plants of a type which are typically adapted to such soil conditions (either highly likely or at least a positive indicator) were found during rainy months in certain of the plowed furrows in the former crystallizers and along the Caltrans ditches. The damper areas on the southernmost tip of parcel 10 and on the southwestern corner parcel 143 also contained such plants.

The court finds from the evidence as a whole that Leslie's property does not contain a prevalence of vegetation which is typically adapted for life in saturated soil conditions.

The court therefore finds from the evidence and from the definition of "wetlands" in 33 C.F.R. § 328.3(b), that the Leslie property is not inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and under normal circumstances it does not support, a prevalence of vegetation typically adapted for life in saturated soil conditions. It is therefore not a "wetland."

For a wetland to be a "water of the United States," there is an additional requirement. The wetland must also be "adjacent to waters" of the United States. 33 C.F.R. § 328.3(a)(7). The term "adjacent" is defined by subparagraph (c) of section 328.3 of that regulation. There was extensive testimony on whether various portions of Leslie's property, if found to be wetlands, were adjacent to waters of the United States. Since the court has concluded the property is not wetland, this adjacency requirement need not be discussed in detail.

Suffice it to say that the Corps' contentions on adjacency were built upon arguments using a jigsaw pattern of various areas of the property which, if deemed to be wetlands, could be "adjacent" to other areas of the property found to be waters of the United States. Most of those contentions have now been resolved against the Corps, because the contested areas were found not to be waters or wetlands.

One of the arguments of the Corps for adjacency is based upon the property that lies west of Thornton Avenue; that is, Newark Slough and the wildlife refuge, which are connected to the Leslie property by the culverts running under Thornton Avenue. The court finds and concludes that even if portions of Leslie's property were found to be wetlands, the adjacency requirement has not been satisfied. The reason is that the condition which created the alleged wetland—that is, the flooding of the wildlife refuge and the resulting backing of water through the culverts— was contributed to by the United States itself and cannot under *City of Fort Pierre*, 747 F.2d 464, be considered in the adjacent wetlands determination.

The court therefore finds and concludes that the property is not a "water of the United States" as defined in 33 C.F.R. § 328, and hence is not within the jurisdiction of the Corps under the Clean Water Act.

## X. *Estoppel*

Leslie also asserts that the Corps is estopped from asserting jurisdiction over the property. The argument is based upon actions which the Corps either did or did not take at the time of the Caltrans construction, the construction of the sewer, and the condemnation and use of the wildlife refuge. However, since the court has determined that the property is not "waters of the United States," and hence is not subject to the Corps' jurisdiction, the court need not consider this argument. The court is therefore making no findings of fact and expressing no opinion on Leslie's argument of estoppel.

## XI. ATTORNEYS FEES

Leslie has requested an award of attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A). Since Leslie is the prevailing party, that statute requires an award of attorneys fees and expenses to Leslie unless this court finds that the position of the United States was substantially justified or that special circumstances make an award unjust. The "substantially justified" standard requires only that the government's position must have been reasonable in law and fact. *Pierce v. Underwood*, —— U.S. ——, 108 S.Ct. 2541, 2549–51, 101 L.Ed.2d 490 (1988).

 While the court believes that some of the government's evidence and arguments were not reasonable, the court nevertheless concludes that the government's position as a whole was substantially justified and that special circumstances make an award to Leslie unjust. The Corps was motivated by a good faith concern for the objectives of Congress and for the Bay Area ecosystem. It was attempting to act in the public interest. The property has a high commercial value, and the amounts expended in this litigation are a very small percentage of its potential value. The government's evidence, although not meeting the burden of persuasion, does meet the burden of substantial justification for the action as a whole. The court therefore declines to award attorneys fees and expenses to Leslie, although Leslie is of course entitled to recover its costs of suit.

IT IS THEREFORE ORDERED that judgment should be entered as follows:

1. The Corps has no jurisdiction over the subject property under Section 10 of the Rivers and Harbors Act, because the property is not a "navigable water of the United States" within the meaning of the Rivers and Harbors Act or the regulations promulgated under that Act.

2. The Corps has no jurisdiction over the subject property under section 404 of the Clean Water Act, because the property is not a "water of the United States" within the meaning of the Clean Water Act or the regulations promulgated under that Act.

3. Leslie's work on the property did not and does not constitute a violation of the Rivers and Harbors Act or the Clean Water Act, and did not and does not require a permit from the Corps of Engineers.

4. In favor of plaintiff and against defendants and intervenors in action No. C–85–8615.

5. In favor of defendants and against plaintiffs in action No. C–86–4187.

Within fifteen (15) days of this order, Leslie is to submit to the court, and serve on the Corps, a proposed form of judgment that conforms to this opinion.