896 F.2d 354
 31 ERC 1139, 20 Envtl. L. Rep. 20,477
 LESLIE SALT CO., a Delaware corporation, Plaintiff-Appellee,
v.
UNITED STATES of America, et al., Defendants,
and
Save San Francisco Bay Association, a non-profit California
corporation; National Audubon Society, a
non-profit New York corporation,
Defendant-Intervenors-Appellants.
UNITED STATES of America, Plaintiff-Appellant,
v.
LESLIE SALT CO., a Delaware corporation; and Cargill, Inc.,
a Delaware corporation, Defendants-Appellees.
 Nos. 89-15244, 89-15337.
 
 Ninth Circuit.
 Argued and Submitted Nov. 16, 1989.
Decided Feb. 6, 1990.
 Michael P. Healy, Dept. of Justice, Land & Natural Resources Div., Appellate Section, Washington, D.C., for defendants, plaintiff-appellant.
 Edgar B. Washburn, Washburn, Briscoe & McCarthy, San Francisco, Cal., for plaintiff-appellee.
 Clement Shute, Jr., Shute, Mihaly & Weinberger, San Francisco, Cal., for defendant-intervenors-appellants, Save San Francisco Bay Ass'n and National Audubon Soc.
 Edwin F. Lowry, Deputy Atty. Gen., San Francisco, Cal., for the amicus curiae, State of Cal.
 Appeal from the United States District Court for the Northern District of California.
 Before FARRIS, PREGERSON and RYMER, Circuit Judges.
 FARRIS, Circuit Judge:
 
 
 1
 This is an appeal from a district court decision denying the Army Corps of Engineers jurisdiction under the Clean Water Act, 33 U.S.C. Sec. 1251 et seq., over a parcel of land near the San Francisco Bay. 700 F.Supp. 476. The Corps had sought to require the landowner to obtain a permit before draining and filling the land, which over many years had acquired some aquatic characteristics. The district court found that because these conditions were artificial and were in part caused by the government, the Corps lacked jurisdiction. We reverse and remand.
 
 BACKGROUND
 
 2
 This dispute revolves around a 153 acre tract of undeveloped land south of San Francisco, called the Newark Coyote Property, owned by Leslie Salt. A road separates the property into two parcels, one of 143 acres ("parcel 143") and one of 10 acres ("parcel 10"). The property abuts the San Francisco National Wildlife Refuge and lies approximately one quarter mile from the Newark Slough, a tidal arm of the San Francisco Bay.
 
 
 3
 The present condition of the property, or rather its condition in late 1985 through 1986 when the Corps claimed jurisdiction, is the result of many artificial changes to the property over the last 100 years. Originally the property was pasture land. The first change occurred early in this century, when Leslie's predecessors in interest constructed facilities for the manufacture of salt. They excavated pits on the eastern one-third of parcel 143 for depositing calcium chloride, and created large, shallow, water-tight basins on the western two-thirds for crystallizing salt. Salt production on the property effectively stopped in 1959. The calcium chloride pits and the crystallizers remained however, and each year they temporarily filled with water during the winter rainy season.[1] The extent of ponding is limited, but standing water did form on the property and remain long enough for fish to live in the ponds. Plant life, which had been nonexistent due to the high salinity and compaction of the soil, formed in the crystallizers after Leslie plowed the property in 1983 to combat a dust problem.
 
 
 4
 The property was also substantially affected by construction of a sewer line and public roads on and around the property. This construction created ditches, road beds, and most importantly, culverts which hydrologically connected the property to the Newark Slough. Caltrans, the state highway authority, also breached a levy on the wildlife refuge adjacent to the property and destroyed a tidegate which had prevented the tidal backflow from reaching Leslie's property.
 
 
 5
 The effect of all this human activity was to foster natural, ecological developments: tidewater reached the edges of Leslie's property and caused the creation of some wetland features on the southern fringes. Migratory birds used the crystallizers and calcium chloride pits as habitat during the winter and spring when they were flooded. In addition, an endangered species, the salt marsh harvest mouse, used the property as habitat.
 
 
 6
 The controversy over this property arose in late 1985 when Leslie started to dig a feeder ditch and siltation pond on parcel 143 in order to drain the land. The Corps soon became aware of this activity and responded by issuing a cease and desist order pursuant to its authority under Section 404 of the Clean Water Act.[2] In that Act Congress directed the Corps, through the Secretary of the Army, to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. Sec. 1251(a). The Corps claimed that Leslie was discharging a pollutant (fill) into waters of the United States in violation of section 301 of the Act.[3] The Corps also claimed that Leslie's activities were obstructing the navigable waters of the United States in violation of section 10 of the Rivers and Harbors Appropriations Act.[4] The Corps issued a second cease and desist order in early 1987 to stop Leslie from placing fill on parcel 10. The Corps issued that order in response to Leslie's attempts to block a culvert that connected its property to the Newark Slough.
 
 
 7
 In sum, the Corps claimed jurisdiction over the majority of the property. Leslie challenged that claim of jurisdiction and filed suit; the Corps countersued. The district court found in favor of Leslie on all grounds, holding that the property was not subject to the Corps' jurisdiction. The United States appealed that decision. Save San Francisco Bay Association and the National Audubon Society intervened on behalf of the United States.
 
 
 8
 The Corps now asserts jurisdiction over the property based on two separate theories which apply to two distinct portions of Leslie's land. First, the Corps argues that most of parcel 10 and the southern tip of parcel 143 are adjacent wetlands that are part of the Corps' Clean Water Act jurisdiction.[5] To resolve this dispute we must first determine whether Congress intended that Clean Water Act jurisdiction should extend to property which government actions helped make aquatic. Because we find that it did, we then look to the Corps' regulations interpreting the Act, to determine whether they allow Corps jurisdiction. The Corps' second theory relates to the former crystallizers and calcium chloride pits. The Corps claims that these features are "other waters," as defined by Corps' regulations, that are subject to its jurisdiction.
 
 STANDARD OF REVIEW
 
 9
 The district court's findings of fact are subject to a clearly erroneous standard of review. Issues of law, as well as mixed questions of fact and law that involve consideration of legal concepts rather than essentially factual inquiries, are reviewable de novo. United States v. McConney, 728 F.2d 1195, 1200-02 (9th Cir.), cert. denied, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).
 
 
 10
 When considering the Corps' interpretation of the Clean Water Act we defer to the agency's analysis if it is "reasonable and not in conflict with the expressed intent of Congress." United States v. Riverside Bayview Homes, 474 U.S. 121, 131, 106 S.Ct. 455, 461, 88 L.Ed.2d 419 (1985); Chevron U.S.A., Inc. v. NRDC, 467 U.S. 837, 844-45, 104 S.Ct. 2778, 2782-83, 81 L.Ed.2d 694 (1984). The agency's interpretation of its own regulations is entitled to greater deference, amounting to a plain error standard. Montana Power Co. v. EPA, 608 F.2d 334, 345 (9th Cir.1979); Chemical Waste Management, Inc. v. EPA, 873 F.2d 1477 (D.C.Cir.1989).
 
 THE SOUTHERN PORTIONS OF THE PROPERTY
 
 11
 The Corps claims that the southern portions of the property are wetlands within its jurisdiction.[6] The district court denied the Corps jurisdiction for three reasons: (1) the wetland conditions were caused by the government, (2) the conditions were not "normal," as required by 33 C.F.R. Sec. 328.3(b), and (3) the property was not adjacent to waters of the United States, as required by 33 C.F.R. Sec. 328.3(a)(7).
 
 A. Governmentally Caused Inundation
 
 12
 We agree with the district court that Congress intended to create a very broad grant of jurisdiction in the Clean Water Act, extending to any aquatic features within the reach of the commerce clause power. See Leslie Salt Co. v. Froehlke, 578 F.2d 742, 755 (9th Cir.1978) (citing California v. EPA, 511 F.2d 963, 964 n. 1 (9th Cir.1975), rev'd on other grounds, 426 U.S. 200, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976)). However, the district court made an exception to this broad Congressional mandate and held that changes to the property caused by the government do not create jurisdiction. The court reasoned that a contrary holding would allow the Corps "to expand its own jurisdiction by creating some wetland conditions where none existed before." While this is a valid concern, the facts of this case do not present such a problem.
 
 
 13
 The district court relied upon United States v. City of Fort Pierre, 747 F.2d 464 (8th Cir.1984). In Fort Pierre, the Corps asserted section 404 jurisdiction over a dry slough that had begun to exhibit wetland characteristics as a direct result of the Corps' dredging activity on a nearby river. The Eighth Circuit held that the Corps did not have jurisdiction due to the "peculiar facts and unique circumstances" of that case, in which "the Corps, as an unintended by-product of ordinary river maintenance, inadvertently create[d] a wetland-type ecological system on private property where no such system previously existed." Id. at 466, 481. The Eighth Circuit recently reaffirmed limiting Fort Pierre to these specific facts. See United States v. Southern Inv. Co., 876 F.2d 606, 612 (8th Cir.1989).
 
 
 14
 The factual situation in this case differs substantially from that in Fort Pierre. Here, the Corps was not directly and solely responsible for flooding Leslie's land: Caltrans constructed the culverts which allowed water to flow onto Leslie's property; Caltrans and the Fish and Wildlife Service breached the levee on the wildlife refuge adjacent to Leslie's property which allowed water to flow up the culverts; Caltrans and the Fish and Wildlife Service failed to place effective floodgates on the culverts; Leslie itself maintained floodgates which unknown third parties propped open. Contrary to the district court's conclusion, the Corps did not itself create the wetland conditions and thereby attempt to expand its own jurisdiction.[7]
 
 
 15
 The fact that third parties, including the government, are responsible for flooding Leslie's land is irrelevant. The Corps' jurisdiction does not depend on how the property at issue became a water of the United States. Congress intended to regulate local aquatic ecosystems regardless of their origin. See, e.g., Swanson v. United States, 789 F.2d 1368 (9th Cir.1986) (Corps construction of a dam creates waters under Corps jurisdiction); United States v. Tull, 769 F.2d 182, 184 (4th Cir.1985) (federal construction of mosquito-control ditch creates waters under Rivers and Harbors Act jurisdiction), rev'd on other grounds, 481 U.S. 412, 414 n. 1, 107 S.Ct. 1831, 1834 n. 1, 95 L.Ed.2d 365 (1987); United States v. DeFelice, 641 F.2d at 1175 (illegal and unauthorized acts of third parties can create Rivers and Harbors Act jurisdiction), cert. denied, 454 U.S. 940, 102 S.Ct. 474, 70 L.Ed.2d 247 (1981); Track 12 Inc. v. District Engineer, U.S. Army Corps of Engineers, 618 F.Supp. 448, 449 (D.Minn.1985) (state and locality construction of highway and sewage system creates Corps jurisdiction). If the Corps' regulations under Clean Water Act jurisdiction harm a landowner, her appropriate response is to seek damages through inverse condemnation proceedings, not to restrict the scope of Corps jurisdiction. Riverside Bayview Homes, 474 U.S. at 128, 106 S.Ct. at 459.
 
 B. Normal Circumstances
 
 16
 The district court's second rationale for denying Corps jurisdiction over the southern portions of the property was a Corps regulation that defines wetlands as an area that "under normal circumstances" supports wetland vegetation. 33 C.F.R. Sec. 328.3(b). Although the district court found the requisite wetland conditions, it held that "circumstances in those areas are not 'normal,' because the ability to support [wetland] vegetation was caused primarily by the government's flooding of the wildlife refuge across [the road]." The district court's interpretation of the "normalcy" requirement is tainted by its holding excluding governmentally created artificial waters from Corps jurisdiction.
 
 
 17
 The phrase "under normal circumstances" is meant to exclude those areas which are not aquatic, but experience an "abnormal presence of aquatic vegetation." 42 Fed.Reg. 37128 (1977). According to the district court's findings, the southern fringes of the parcel are aquatic areas. The fact that these wetlands are man-made does not make them "abnormal." Whether the wetlands are artificially or naturally created is irrelevant to this determination.
 
 C. Adjacency
 
 18
 We disagree with the district court's third alternative holding, that this wetland is not adjacent to waters of the United States, as required by 33 C.F.R. Sec. 328.3(a)(7). In reaching this conclusion, the district court again relied on its decision to exclude from consideration any consequences of the backflow through the culverts created by Caltrans and the Fish and Wildlife Service. In the absence of this erroneous holding, the southern portions of the property are adjacent to waters of the United States--the water in the culvert, which is directly connected to the Newark Slough.
 
 THE CRYSTALLIZERS AND PITS
 
 19
 The Corps determined that the former crystallizers and calcium chloride pits qualified as "other waters" that were under Corps jurisdiction according to 33 C.F.R. Sec. 328.3(a)(3). That section defines "waters of the United States" to include:
 
 
 20
 All other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect interstate or foreign commerce....
 
 
 21
 The district court held that the crystallizers and pits were not described by this section for two reasons. First, because they are artificial structures and the regulation lists only natural formations. Second, the court concluded that the ponding was too temporary to qualify as other waters. The district court also addressed but did not decide the question of whether the property has a sufficient connection to interstate commerce.
 
 A. Artificial vs. Natural Formations
 
 22
 The district court applied the doctrine of ejusdem generis[8] to construe the regulations to exclude artificially created waters. The court noted that all the waters listed as "other waters" in section 328.3(a)(3) were naturally created, and concluded that the artificially created crystallizers and calcium chloride pits could not be covered by that section. The ejusdem generis rule of statutory construction is used to illuminate the intent of the drafters; when the rule conflicts with other, clearer indications of intent, its results should be ignored. See Weyerhaeuser S.S. Co. v. United States, 372 U.S. 597, 601, 83 S.Ct. 926, 928, 10 L.Ed.2d 1 (1963); Black's Law Dictionary, 464 (5th ed. 1979). Reliance on the rule is inappropriate in this case.
 
 
 23
 First, the district court's interpretation conflicts with other parts of the Corps' regulations which assert that the Corps generally has jurisdiction over man-made waters under both the Clean Water Act and the Rivers and Harbors Act. See 33 C.F.R. Secs. 328.5, 329.8. The Corps also defines at least one of the features listed in section 328.3(a)(3) to include artificial waters. See 33 C.F.R. Sec. 323.2(b) ("lake" includes "a standing body of open water created by artificially blocking or restricting the flow of a river, stream or tidal area"). In addition, the Corps' comments to the final regulations support the power of the Corps to assert jurisdiction over artificially created waters:
 
 
 24
 [W]e generally do not consider the following waters to be "waters of the United States." However, the Corps reserves the right on a case-by-case basis to determine that a particular waterbody within these categories of waters is a water of the United States.
 
 
 25
 * * * * * *
 
 
 26
 (c) Artificial lakes or ponds created by excavating and/or diking dry land to collect and retain water and which are used exclusively for such purposes as stock watering, irrigation, settling basins, or rice growing.
 
 
 27
 * * * * * *
 
 
 28
 (e) Waterfilled depressions created in dry land incidental to construction activity and pits excavated in dry land for the purpose of obtaining fill, sand or gravel unless and until the construction or excavation operation is abandoned and the resulting body of water meets the definitions of waters of the United States (see 33 C.F.R. 328.3(a)).
 
 
 29
 51 Fed.Reg. 41206, 41217 (1986) (emphasis added). These comments show that the Corps intends to exempt from its jurisdiction only those artificially created waters which are currently being used for commercial purposes, and that even those waters are subject to such jurisdiction on a "case-by-case" basis of review. The crystallizers and calcium chloride pits have not been used for commercial purposes for decades and so are not subject to even this limited exemption. Finally, courts have uniformly included artificially created waters in the Corps' jurisdiction under the Clean Water Act and the Rivers and Harbors Act. See, e.g., Tull, 769 F.2d 182 (mosquito-control ditch); Stoeco Dev. Ltd. v. Dept. of the Army Corps of Eng'rs, 701 F.Supp. 1075, 1078 (D.N.J.1988) (artificially created wetland), appeal dismissed, 879 F.2d 860 (3rd Cir.1989); United States v. Akers, 651 F.Supp. 320 (E.D.Cal.1987) (same); Track 12, 618 F.Supp. 448 (same); United States v. Ciampitti, 583 F.Supp. 483 (D.N.J.1984) (same), affirmed, 772 F.2d 893 (3rd Cir.1985), cert. denied, 475 U.S. 1014, 106 S.Ct. 1192, 89 L.Ed.2d 307 (1986). We reject the district court's interpretation of the regulations as creating a distinction between artificial and natural waters.
 
 B. Temporary Water Formations
 
 30
 The district court also held that the crystallizers and calcium chloride pits were not other waters because they "are in fact dry most of the year." Due to the climate in the Bay Area, ponding only occurs during the winter rainy season. The seasonal nature of the ponding is no obstacle to Corps jurisdiction however, because the regulations specifically enumerate two seasonal water features as other waters: intermittent streams and playa lakes. See Quivira Mining Co. v. EPA, 765 F.2d 126, 130 (10th Cir.1985), cert. denied, 474 U.S. 1055, 106 S.Ct. 791, 88 L.Ed.2d 769 (1986); United States v. Phelps Dodge Corp., 391 F.Supp. 1181, 1187 (D.Ariz.1975).
 
 
 31
 The Corps' determination that the crystallizers and calcium chloride pits are similarly seasonal bodies of water within the meaning of the regulations is proper. We reverse the district court's contrary conclusion.
 
 C. Interstate Commerce
 
 32
 The crystallizers and pits must still have sufficient connections to interstate commerce to come under the Corps' jurisdiction as "other waters." 33 C.F.R. Sec. 328.3(a)(3). The Corps has adopted the following EPA criteria to determine when waters have sufficient ties to interstate commerce:
 
 
 33
 [Waters]
 
 
 34
 a. Which are or would be used as habitat by birds protected by Migratory Bird Treaties; or
 
 
 35
 b. Which are or would be used as habitat by other migratory birds which cross state lines; or
 
 
 36
 c. Which are or would be used as habitat for endangered species....
 
 
 37
 51 Fed.Reg. 41206, 41217. The district court failed to determine whether the crystallizers and pits meet these standards. The record showed however, that migratory birds (including many protected by Migratory Bird Treaties) and one endangered species may have used the property as habitat. The commerce clause power, and thus the Clean Water Act, is broad enough to extend the Corps' jurisdiction to local waters which may provide habitat to migratory birds and endangered species. See Utah v. Marsh, 740 F.2d 799, 804 (10th Cir.1984); Palila v. Hawaii Dep't of Land and Natural Resources, 471 F.Supp. 985, 991-95 (D.Haw.1979), aff'd, 639 F.2d 495 (9th Cir.1981). See generally Hughes v. Oklahoma, 441 U.S. 322, 329-36, 99 S.Ct. 1727, 1732-36, 60 L.Ed.2d 250 (1979). We remand this issue to the district court to determine if the property has the requisite connections to interstate commerce.
 
 CONCLUSION
 
 38
 The southern portions of Leslie's property meet both the statutory and regulatory requirements for the Corps to exert Clean Water Act jurisdiction over them. The fact that the government in part caused the inundation of the property is not of consequence. Similarly, the government's actions do not affect the normalcy or adjacency requirements of the regulations. As to the crystallizers and calcium chloride pits, their artificiality and temporary wetness pose no obstacle to Corps jurisdiction. We remand to the district court for a factual determination of the sufficiency of the property's connections to interstate commerce. Because the record reflects that the Corps' jurisdiction does not extend to the total property, we also remand to determine over which portion of the property the Corps has valid jurisdiction in light of this opinion's legal conclusions. Costs will abide the final determination.
 
 
 39
 REVERSED and REMANDED.
 
 
 40
 RYMER, Circuit Judge, concurring in part, dissenting in part:
 
 
 41
 I join in the majority's holding that the southern portions of Leslie's property meet the Clean Water Act requirements for Corps' jurisdiction. I disagree, however, with the majority's conclusion that the district court erred in its treatment of the crystallizers and calcium chloride pits.
 
 
 42
 The crystallizers and pits are seasonal bodies of water that derive their major source of water from rain. There is standing water in the crystallizers and pits during the winter rainy season, when the rain collects, until early to mid-spring, when all the water has evaporated. The rest of the year the crystallizers and pits are dry. Although the majority is correct that "the seasonal nature of the ponding is no obstacle to Corps' jurisdiction," the cycle of ponding in the crystallizers and pits creates no hydrological connection with any other body of water. This fact distinguishes Quivira Mining Co. v. EPA, 765 F.2d 126 (10th Cir.1985) and United States v. Phelps Dodge, 391 F.Supp. 1181 (D.Ariz.1975). Even though three fish may have found their way into one of the ponds, there is nothing in the record to show that water flows directly or indirectly from the crystallizers or pits into another body of water.
 
 
 43
 That being the case, the district court correctly determined that the crystallizers and pits are not "other waters" within the meaning of section 328.3(a)(3). It is therefore unnecessary to reach the issue on which the Supreme Court has declined to rule, see United States v. Riverside Bayview Homes, 474 U.S. 121, 131 n. 8, 106 S.Ct. 455, 461 n. 8, 88 L.Ed.2d 419 (1985): whether the Clean Water Act extends Corps' jurisdiction to waters that are not "adjacent to bodies of open water."[1]
 
 
 
 [1]
 The San Francisco Bay area has a Mediterranean climate, in which rain falls primarily in the winter and spring, followed by a long dry season
 
 
 [2]
 Section 404(a) of the Clean Water Act, 33 U.S.C. Sec. 1344(a) (1982), provides in pertinent part:
 The Secretary [of the Army] may issue permits ... for the discharge of dredged or fill material into the navigable waters at specified disposal sites.
 
 
 [3]
 Section 301(a) of the Clean Water Act, 33 U.S.C. Sec. 1311(a) (1982), provides in pertinent part:
 Except as in compliance with this section and section[ ] ... 1344 of this title, the discharge of any pollutant by any person shall be unlawful.
 The Act defines fill as a pollutant at 33 U.S.C. Sec. 1362(6).
 
 
 [4]
 Section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. Sec. 403 (1982), provides in pertinent part:
 The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; ... and it shall not be lawful to excavate or fill ... any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same.
 
 
 [5]
 The Corps also claims that the southern portions of the property are affected by the ebb and flow of the tide, and thus are subject to the Corps' jurisdiction under the Clean Water Act and the Rivers and Harbors Act. See 33 C.F.R. Secs. 328.3(a)(1), 328.4(b)(1) and 329.12(a)(2). See also United States v. DeFelice, 641 F.2d 1169, 1175 n. 15 (5th Cir. Unit A April 1981) (citing cases). Because we find in favor of the Corps on its wetlands claim, we do not reach this alternate argument
 
 
 [6]
 The Corps initially claimed that almost all of the property qualified as a wetland. The United States only appeals the district court's determination as to the southern portions of the property, which the district court found had the physical characteristics of wetlands
 
 
 [7]
 All parties agree that the district court's statement that "the Corps flooded the wildlife refuge and thereby brought tidewater further inland," directly contradicts the record and its own statement of facts
 
 
 [8]
 The "ejusdem generis rule" is, that where general words follow an enumeration of persons or things, by words of a particular and specific meaning, such general words are not to be construed in their widest extent, but are to be held as applying only to persons or things of the same general kind or class as those specifically mentioned.... [The rule does not] apply when the context manifests a contrary intention
 Black's Law Dictionary, 464 (5th ed. 1979). See also 2A Sutherland Statutory Construction Sec. 47.17 at 103 (4th ed. 1973).
 
 
 [1]
 The majority holds that "the commerce clause power, and thus the Clean Water Act, is broad enough to extend the Corps' jurisdiction to local waters which may provide habitat to migratory birds and endangered species." Congress does have power under the Commerce Clause to regulate wildlife and endangered species. Palila v. Hawaii Dep't of Land and Natural Resources, 471 F.Supp. 985 (D.Haw.1979), aff'd 639 F.2d 495 (9th Cir.1981) and Hughes v. Oklahoma, 441 U.S. 322, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1976) stand for that proposition. However the issue in this case is not whether Congress has the power under the Commerce Clause to regulate wildlife and endangered species, but whether Congress meant to extend Corps' jurisdiction under the Clean Water Act to the full extent of its commerce clause power. Specifically, it is: is it reasonable for Corps' jurisdiction to rest on the fact that migratory birds and endangered species may use the waters as a habitat? In Utah v. Marsh, 740 F.2d 799 (10th Cir.1984), the other opinion on which the majority relies, the lake was used for several purposes that established a connection to interstate commerce. It is unclear whether the Marsh court would have found a substantial enough effect on interstate commerce, and thus Corps' jurisdiction under the Clean Water Act, had the only connection to interstate commerce been that "the lake was on flyway of several species of migratory waterfowl...." Id. at 803
 In addition, in Riverside Bayview Homes the Supreme Court held that since the Corps' asserted jurisdiction over adjacent wetlands was brought to the attention of Congress "through legislation specifically designed to supplant it" (Congress' consideration of the Clean Water Act of 1977, a major piece of legislation aimed at achieving "interim improvements within the existing framework" of the Clean Water Act, H.R.Rep. No. 95-139 pp. 1-2 (1977)), and Congress rejected efforts designed to curb that jurisdiction, that was "at least some evidence of the reasonableness of the [Corps'] construction." 474 U.S. at 137, 106 S.Ct. at 464. Such evidence of reasonableness does not exist in this case. The Corps issued new regulations governing its regulatory programs on November 13, 1986 in order to clarify the scope of the Section 404 permit program. The new regulations placed the definition of "waters of the United States" into a new Part 328 of Title 33 of the Code of Federal Regulations. As a further clarification, and as an addition to the old regulations, the new regulations stated that "waters of the United States" also include the following: areas which are "or would be" used as a habitat for migratory birds or endangered species. 33 C.F.R. Sec. 328.3(a)(3). This 1986 addition to, or clarification of, the Corps' regulations was not considered during congressional debates on the Clean Water Act of 1977. Therefore, the evidence of reasonableness that the Supreme Court found regarding the Corps' regulations in Riverside Bayview Homes does not apply to the 1986 clarification of those regulations, in particular, the list that includes migratory and endangered species habitats.