**GOLDEN GATE AUDUBON SOCIETY, INC., et al., Plaintiffs,**

**v.**

**UNITED STATES ARMY CORPS OF ENGINEERS, et al., Defendants.**

**No. C87–6063 TEH.**

United States District Court, N.D. California.

June 26, 1992.

See also 732 F.Supp. 1014.

**1308**

Zach Cowan, San Francisco, Cal., Alan Waltner, Gorman & Waltner, Oakland, for plaintiffs.

Stanley P. Hebert, Thomas P. Clark, Oakland, Cal., Karen L. Egbert, Environmental Defense Section, Land & Natural Resources Div., Benjamin F. Wilson, Brenda Mallory, Beveridge & Diamond, Washington, D.C., William T. McGivern, Jr., U.S. Attys. Office, San Francisco, Cal., Barry M. Hartman, U.S. Dept. of Justice, Environment & Nat'l Resources Div., Washington, D.C., for defendants.

## AMENDED ORDER

THELTON E. HENDERSON, Chief Judge.

This matter comes before the Court on Plaintiffs', the Army Corps of Engineers' and the Port of Oakland's cross-motions for summary judgment. The motions came on for oral argument on June 15, 1992. After careful consideration of the parties written and oral arguments, and for the reasons stated below, the Court once again vacates the Army Corps of Engineers' (hereafter, "the Corps") jurisdictional disclaimer and remands the wetlands determination to the Corps with the instructions provided below. The Court therefore GRANTS IN PART AND DENIES IN PART plaintiffs' motion for summary judgment, and DENIES both the Port's and the Corps' motions for summary judgment. The Court retains jurisdiction over the action.

## FACTUAL BACKGROUND

This case has been before this Court for almost 5 years. It concerns the Port's dredging and filling of the "Distribution Center" (hereafter "center" or "site") adjacent to the San Leandro Bay. This Court's previously published opinion in this case (*Golden Gate Audubon Society, Inc. v. United States Army Corps of Engineers*, 717 F.Supp. 1417 (N.D.Cal.1988) (*Audubon I*)) details the facts which led to this litigation, and we will not repeat those facts now. Rather, we will focus the facts relevant to the instant motions, this Court's decision in *Audubon I*, and the events which have transpired since that decision.

The Clean Water Act was enacted in 1972. 33 U.S.C. §§ 1251 et seq. In that Act, Congress directed the Corps, through the Secretary of the Army, to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

Section 101(a) of the Act prohibits the discharge of dredged spoil or fill material into "navigable waters," except in accordance with a permit issued by the Secretary of the Army, acting through the Corps, under § 404(a) of the Act. 33 U.S.C. § 1344(a). Section 502(7) defines "naviga-

ble waters" as "waters of the United States." 33 U.S.C. § 1362(7).

Prior to 1975, if a site was above the Mean Higher High Water (MHHW) line, it was considered "upland" or "dry land" and thus outside of the Corp's "waters of the United States" jurisdiction. In 1975, however, the Corps expanded jurisdiction to bring previously nonjurisdictional wetlands under Corps jurisdiction. In July 1975, the Corps issued regulations defining "waters of the United States" to include not only actually navigable waters but all "wetlands" that are adjacent to traditionally defined navigable waters, tributaries of these waters, and interstate waters, whether navigable or not, and their tributaries. 40 Fed.Reg. 31,320, 31,324 (July 25, 1975). The Corps also expanded its jurisdiction to "other waters" of the US, including streams, wetlands, playa lakes and natural ponds, if the use, degradation or destruction of those areas could effect interstate commerce. 33 C.F.R. § 323.2(a)(3) (1986), *renumbered as* 33 C.F.R. § 328.3(a)(3) (1988).

*Audubon I*

The Port of Oakland began dredging and filling the waters of the San Leandro Bay, concededly wetlands at the time, in 1965, prior to the passage of the Clean Water Act. Between 1972 and 1986, the Port continued to fill the site without a permit. In 1987, the Corps looked into the filling, but determined that because the site had been transformed to dry land by the filling, that the "normal circumstances" of the site was not wetlands and that it therefore lacked jurisdiction to impose permit requirements under § 404. In 1988, in *Audubon I*, this Court found that determination to be arbitrary and capricious.

The Corps, and the Port, had alleged that although the site did contain wetlands, that " 'those areas would not be wetlands "under normal circumstances" ' since the ' "normal circumstances" for these areas is that they are part of a longstanding and ongoing fill project' in which the wetlands appear between dormant stages of the project." *Audubon I*, 717 F.Supp. at 1421. The "normal circumstances" issue resulted

from the regulatory definition of *wetlands,* which defines wetlands as:

> those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that *under normal circumstances* do support, a prevalence of vegetation typically adapted for life in saturated soil conditions.

33 C.F.R. 328.3(b) (emphasis added). As we noted in *Audubon I,* "in essence, the Corps found that the filling of the wetlands, and its transformation from wet to dry land, constitutes the normal circumstances of the site." *Id.*

The Corps made this determination based in large part on the Corps regulatory statement "that it did not intend to 'assert jurisdiction over the areas that once were wetlands and part of an aquatic system, but which, in the past have been transformed into dry land for various purposes.' " *Id.,* citing 42 Fed.Reg. at 37128. The Corps had also issued a regulatory letter in which it had stated that " 'if a former wetland has been converted to another use' and 'that use alters its wetlands characteristics to such an extent that it is no longer a "water of the United States," ' the Corps will not assert jurisdiction over the site." *Id.,* citing Regulatory Guidance Letter No. 86–9, August 27, 1986 at 2.

We found that the Corps was reading this language much too broadly. As read by the Corps, the "exception" would have swallowed the rule—it would have allowed a developer surreptitiously to fill a site to destroy the wetland vegetation, and thus destroy jurisdiction, and then to avail itself of the "conversion" exemption to the permit requirements. Thus, by breaking the law developers would remove themselves from the law's jurisdiction.

We therefore found that the "exception" for "converted" land had a temporal limitation—"that the language must only apply to those situations in which wetlands were converted to dry land before 1975, the date the Corps acquired jurisdiction over adjacent wetlands." *Id.* Because the Corps had not made a finding that the site was dry land as of 1975, we remanded the case

to the Corps for proper findings, holding that

> If in fact the Port had not transformed the site into dry land by 1975, and instead was eliminating Section 404 jurisdiction by filling the site, the Corps was precluded from finding that the filled site constituted its normal circumstances. If the site had been transformed into dry land by 1975, however, the Corps could find that the dry land was its normal circumstances, since the regulatory definition does not retroactively extend the Corps' jurisdiction over areas that have been transformed into dry land.

*Id.* at 1422.

*1991 Jurisdictional Determination*

The Corps has now returned with a finding that the site was converted to dry "uplands" by 1975. It based this determination on a finding that the site had been completely filled by April 1972, thus destroying the previously existing wetlands prior to the enactment of the Clean Water Act. Corps' Memorandum in Support for Motion for Summary Judgment at 8 (hereafter, "Corps' Memo"), citing Administrative Record 48 at 1871 (hereafter "A.R."). However, the Corps also found that biological wetlands *were* present at the site in July 1975, but concluded that because the site had previously been converted to dry land, those wetlands were "nonjurisdictional" wetlands.

The Corps also found that wetlands re-emerged at various locations throughout the site from 1972 to 1986. It went on to find that although the Port continued to use and develop most of the site, that the Port had abandoned the northwestern portion of the site. It concluded that on areas which had not been abandoned, wetlands were not the "normal circumstances" of the site and thus remained nonjurisdictional, but that the wetlands that had re-emerged on the abandoned area were the "normal circumstances" of that area and thus under Corps jurisdiction. Corps's Memo at 17–18. The Corps also found that certain bodies of water on the cite were "other waters of the United States" subject to jurisdiction, and that a small area of the site was tidally influenced and thus under Corps jurisdiction.

The Corps seeks summary judgment upholding this jurisdictional determination. The Port seeks summary judgment upholding the Corps' "dry by 1975" conclusion, but vacating the Corps' "abandonment" and "other waters" determination. Plaintiffs seek an order vacating the Corps' entire jurisdictional determination as arbitrary and capricious.

## I. *JURISDICTIONAL DISCLAIMER:*

The present motions call upon this Court to examine, once again, the Corps' "normal circumstances" analysis to determine as a matter of law whether that analysis comports with the law and the expressed intent of Congress. The parties are in basic agreement as to the facts underlying the Corps' jurisdictional determination, and argue instead about the legal conclusions to be drawn from those facts. Therefore, summary judgment is appropriate in this case.[1] As before, we are guided by several overarching principles of administrative law.

We review the wetlands determination under Section 706(2)(A) of the APA. *Avoyelles Sportsmen's League, Inc. v. Marsh,* 715 F.2d 897, 904 (5th Cir.1983). Section 706(2)(A) provides that the reviewing court shall set aside agency findings only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

---

1. Summary judgment is appropriate when there is no genuine dispute as to material facts and the moving party is entitled to judgement as a matter of law. *Jung v. FMC Corp.,* 755 F.2d 708, 710 (9th Cir.1985); Fed.R.Civ.P. 56. Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1976). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Id.* The court may not weigh the evidence, and is required to view the evidence in the light most favorable to the non-moving party. *Id.* A grant of summary judgment is reviewed *de novo* by the appellate court; a denial of summary judgment is reviewed for an abuse of discretion. *U.S. v. 5,644,540 in U.S. Currency,* 799 F.2d 1357, 1361 (9th Cir.1986).

the law." "While this standard of review is deferential to the agency, courts may not abdicate their responsibility to review the agency's action under this standard by rubberstamping the agency's conclusions." *Audubon I, citing Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.,* 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Instead, the arbitrary and capricious standard calls upon courts to make a "searching and careful" review of the record to determine whether the agency's decision is based upon a consideration of the relevant facts" and whether "there has been a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).

The Corps' 1991 Jurisdictional determination was a two part finding. First, it found that by April, 1972 the Port had filled the site to a level above MHHW and that the fill had destroyed the previously existing tidal marsh and other aquatic habitat and converted the site to dry land. However, it expressly found that there *were* wetlands on the site in 1975, when the Corps exerted jurisdiction over wetlands.[2] Therefore, as the second step the Corps determined that the wetlands present on the site in 1975 were nonjurisdictional "abnormal" wetlands because the "normal circumstances" of the site, as established in 1972, was dry land. According to the Corps, the 1975 wetlands had "reappeared" on the site, and whenever wetlands "reappear" on a site, the Corps must determine whether those wetlands are abnormal or whether they constitute the normal circumstances of the site.

As in 1988, this Court finds that the Corps' jurisdictional determination is contrary to law because the Corps misread (again) the statutory definition of wetlands so as to misapply the "under normal circumstances" language of that definition.

A. *"Dryness" as of 1975*

■ As noted above, wetlands came under the Corps' jurisdiction in 1975 when the definition of "waters of the United States" was amended and expanded. Also as noted above, we remanded this case to the Corps for a determination of whether the site had been converted to "dry land" by 1975. The Corps seems to have taken us literally on this, concluding that so long as it finds that a site was dry *at any time* before 1975, that the presence of wetlands on a site in 1975 was irrelevant to Corps jurisdiction. Thus, according to the Corps, no jurisdiction attached to the present site in 1975 because there were no wetlands present on the site in 1972.

■ Unlike *Audubon I,* where the Corps read provisions of the Acts language too broadly, here the Corps has read the Act too narrowly. Assuming that the Corps' determination was correct, and that the site contained no evidence of wetlands in 1972, that does not answer the question of whether the Corps had jurisdiction over the site in 1975. Rather, the 1975 expansion of jurisdiction brought *all* wetlands under Corps jurisdiction, so long as those wetlands were within the reach of Congress' Commerce Clause and were not specifically exempted from coverage. *United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 106 S.Ct. 455, 460, 88 L.Ed.2d 419 (1985); *see also United States v. Ciampitti,* 583 F.Supp. 483, 494 (D.N.J. 1984), *and Leslie Salt Co. v. U.S.,* 896 F.2d 354, 358 (9th Cir.1990).[3] The Act simply

2. The Corps specifically found that "areas of biological wetlands probably were present on the site by July 1975...." A.R. at 1896. The Corps further found that "biological wetlands re-emerged in various locations at the site between 1972 and 1986, and biological wetlands were probably present on the site in July of 1975." A.R. at 1971. Finally, the Corps specifically stated that "it is our judgment that the ponds with apparent fringe vegetation which are visible in the 1975 aerial photographs were probably biological wetlands." A.R. at 1873.

3. Interesting, the Port devotes a substantial amount of its briefing to the argument that Corps jurisdiction over wetlands is *limited* because it "only" reaches as far as Congress' Commerce Clause power, and that the present site falls outside of Corps jurisdiction because it lacks sufficient connection to interstate commerce. We reject that argument. The 9th Circuit, noting that the Corps has adopted EPA criteria to determine when waters have sufficient ties to interstate commerce, specifically held that "the commerce clause power, and thus

did not discriminate between types of wetlands other than to set out a few, very narrowly defined exceptions. Thus, if there *were* non-exempt wetlands on the site in 1975, they were subject to Corps jurisdiction.

When we directed the Corps, in *Audubon I*, to determine whether the site was "dry" by 1975, we were not asking it to decide whether the area had been turned into a desert by that date. Rather, we were ordering the Corps to determine whether or not the land contained wetlands on that date, over which the Corps has jurisdiction. What the Corps failed to consider was that since 1975, it has been legally impossible for a site which contains wetlands to be "dry." On the contrary, by definition those sites which contain wetlands are under Corps jurisdiction.

### B. *"Under Normal Circumstances" Analysis*

■ The Corps contends that this is an incorrect interpretation of the Act, and attempts to recast its old "under normal circumstances" argument to defeat 1975 jurisdiction. As noted above, the Corps specifically found that "areas of biological wetlands probably were present on the site by July 1975...." A.R. at 1869. The Corps discounted the presence of those wetlands by making the following determination: "but at this time [1975] these wetlands were not jurisdictional wetlands under the 'normal circumstances' principle ... the normal circumstances of the site were that of a filled area with ongoing filling and other construction operations." Admin. Record at 1869. Only if a formerly converted area "is abandoned and over time regains its wetland characteristics such that it meets the definition of 'wetlands,'

[will] the Corps' 404 jurisdiction [be] restored."[4] The Corps interprets this to mean that if an area is not "abandoned", then even if wetlands re-emerge on that site, there is no Corps jurisdiction over that site.[5]

Although generally an administrative agency's interpretations of the laws it is empowered to enforce are entitled to deference, the Court must overrule that interpretation if it is arbitrary, capricious, or otherwise not in accordance with law. APA § 706. In reviewing an agency construction of the CWA, we must determine "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Wyckoff Co. v. EPA*, 796 F.2d 1197, 1200 (9th Cir. 1986) (quoting *Chevorn, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984).

In the present case, the Corps' "under normal circumstances" analysis is legally flawed in several respects, and thus not entitled to this Court's deference. The Corps posits a two step analysis in which the Corps first looks to see whether wetlands are present, and then determines whether those wetlands are "normal." This analysis imposes an additional "qualification" for jurisdiction (other than wetland status) which is circular, redundant and simply does not exist.

■ As we noted in *Audubon I*, and as the 9th Circuit noted in *Leslie Salt Co. v. U.S.*, 896 F.2d 354, 358 (1990), "the phrase 'under normal circumstances' is meant to exclude those areas which are not aquatic,

---

the Clean Water Act, is broad enough to extend the Corps' jurisdiction to local waters which may provide habitat to migratory birds and endangered species." *Leslie Salt Co. v. United States*, 896 F.2d 354, 369 (9th Cir.1990). The Port does not and cannot contend that the Corps' finding that migratory birds frequented the ponds present on the site is unsupported by the administrative record.

4. With regard to the area that the northwestern section of the site, the Port was found to have

abandoned the area, and thus the "normal circumstances" of that area was wetlands subject to Corps jurisdiction.

5. The Corps similarly discounted the re-emergence of wetlands on the site between 1972 and 1986, concluding that so long as the Port continued to fill the site, the "normal circumstances" of the site was a filled, developing site and the presence of wetlands on those areas was "abnormal."

but experience an 'abnormal presence of aquatic vegetation.' " This language protects wetlands from those individuals who would destroy aquatic vegetation in order to avoid permit review, and developers from retroactive application of the 1975 expansion of jurisdiction. *Audubon I,* 717 F.Supp. at 1421. As the Corps stated in the preamble to the 1977 regulations, it did not intend "to assert jurisdiction over those areas that *once were* wetlands and part of an aquatic system, but which, in the past, have been transformed into dry land for various purposes." 42 Fed.Reg. at 37,128 (emphasis added). Therefore, "if a former wetland has been converted to another use ... and that use alters its wetland characteristics *to such an extent that it is no longer a 'water of the United States,'* that area will no longer come under Corps regulatory jurisdiction for purposes of Section 404." *Id.* (emphasis added).

■ This language provides no support for the Corps' position. On the contrary, these excerpts clearly state that if a site has been legally converted to dry land, so that it no longer meets the regulatory definition of "wetlands," that site will not come under Corps jurisdiction. It does not create a distinction between "normal" and "abnormal" wetlands.

The regulatory definition of wetlands makes no mention whatsoever of "normal" vs. "abnormal" wetlands. On the contrary, wetlands are defined as:

> those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that *under normal circumstances* do support, a prevalence of vegetation typically adapted for life in saturated soil conditions.

33 C.F.R. 328.3(b) (emphasis added). Thus, in order for an area to *be* a wetland, it must be determined that that area, *under normal circumstances,* supports the proper vegetation, etc. If the area cannot *normally* sustain that life, it is, by definition, not a wetland.

■ That means that by the very process of determining whether an area is or is not wetlands, the Corps determines what the "normal circumstances" of that area are. An area can only be wetlands *if* its normal circumstances are to support wetland vegetation, etc. Put another way—it is impossible to state that the "normal circumstances" of an area which contains wetlands is anything other than "wetlands."

Therefore, as a legal matter, the Corps' finding that the site contained wetlands, but that the "normal circumstances" of the site was dry land, is nonsensical. The "under normal circumstances" language allows the Corps to find that an area which is exhibiting wetland characteristics is nonetheless *not* a wetland because the area cannot *under normal circumstances* support that type of vegetation, etc. It does not allow the Corps to find that the presence of wetlands in an area is abnormal. On the contrary, by finding that "wetlands" are present, the Corps determines that their presence is normal.

■ Furthermore, the Corps' application of the "under normal circumstances" language attempts to create an exception to Corps jurisdiction that does not exist. Under the Clean Water Act, the only "nonjurisdictional" wetlands are those specifically exempted under § 1344(f) or which manage somehow to be beyond the reach of Congress' Commerce Clause power. The 9th Circuit has followed other circuits in holding that these exemptions are to be construed narrowly, so as to have a limited scope. *United States v. Akers,* 785 F.2d 814, 819 (9th Cir.1986). Other that these exceptions, *all* wetlands are under Corps jurisdiction. *See Riverside Bayview,* 106 S.Ct. at 460; *Akers,* 785 F.2d at 818. Therefore, it is not possible under the Act to determine that a non-exempted wetland is beyond the Corps' jurisdiction. By virtue of being a wetland, the area is jurisdictional.

■ Finally, the Corps' interpretation is in conflict with the law of this Circuit and violates Congressional intent. Under *Leslie Salt Co. v. U.S.,* 896 F.2d 354 (9th Cir.1990), the *only* prerequisite for Corps jurisdiction after 1975 is that wetlands be

present, as they were on this site in 1975 and after. *Id.* at 358. It is irrelevant whether the wetlands have always been there, are re-emergent wetlands, or are man made wetlands. Thus, *Leslie Salt* found Corps jurisdiction over manmade wetlands, stating that "the Corps' jurisdiction does not depend on how the property at issue became a water of the United States. Congress intended to regulate local aquatic ecosystems regardless of their origin." *Id.* at 358. *See also United States v. Akers,* 651 F.Supp. 320, 322 (E.D.Cal.1987) (No language in CWA "suggests that the manner in which the wetland was created or is maintained is relevant to whether it falls within the scope of the Clean Water Act. On the contrary, the plain language of the regulations emphasizes the nature of the land in question, not the manner in which it might have reached its wetland state."), *and United States v. Ciampitti,* 583 F.Supp. 483, 494 (D.N.J. 1984) ("federal jurisdiction is determined by whether the site is presently wetlands and not by how it came to be wetlands."). Therefore, so long as there *are* wetlands on the site, and they are in any way within Congress' Commerce Clause power, they are subject to Corps jurisdiction.

As we noted in *Audubon I,* and as the 9th Circuit noted in *Leslie Salt,* Congress intended to create a very broad grant of jurisdiction in the Clean Water Act. 717 F.Supp. at 1422; 896 F.2d at 357. Congress had a broad goal of protecting and preserving ecosystems, and chose to achieve that goal in part by prohibiting the discharge of pollutants without a permit. *Audubon I,* 717 F.Supp. at 1422. The CWA conditions federal jurisdiction on the existence of wetlands, rather than on how those wetlands came to be wetlands, which "is entirely consistent with Congress' intent that waters be defined as broadly as possible in order to provide the maximum degree of protection for the environment." *Akers,* 651 F.Supp. at 322. The Corps' rationale, which literally exempts from the CWA's permit requirements—without statutory authorization—those wetlands which re-emerge on nonabandoned sites, undermines that Congressional purpose.

## C. *Remand Issue*

 In 1988, plaintiffs expressed great concern with this Court's decision to remand the jurisdictional determination to the Corps. They feared "that the Corps [would] be less than impartial in their renewed consideration; they [would] merely rationalize their prior decision, and not generally reconsider it." *Audubon I,* 717 F.Supp. at 1423. Plaintiffs fears seems to have been borne out. As a result, plaintiffs now request that the Court order the Corps to answer certain specific questions, and then make its *own* jurisdictional determination in place of the Corps.

The Corps and the Port argue, persuasively, that we would be abusing our discretion and usurping the Corps' position by doing so. Although the Court is greatly distressed by the Corps persistent attempts to undermine the reach of the Clean Water Act, it is, in the final analysis, the Corps' duty to make a jurisdictional determination in this matter. Therefore, the Court remands this issue to the Corps for a jurisdictional determination consistent with this Opinion.

In accordance with this Court's retention of jurisdiction over this case, we deem it important to inform the Corps that we will not countenance another 3 year delay between this remand and a jurisdictional determination. Based upon the administrative record and the Corps own findings, it is clear that the Corps has had jurisdiction over large portions of the site since 1975. The administrative record has been developed, and the Court is aware of its contents. We will look with great skepticism upon any new "findings" inconsistent with that record. Furthermore, the Court can foresee no reason why a jurisdictional determination based upon these findings should not be accomplished within 180 days of the date of this Order.

With these admonitions, we remand the determination to the Corps for what, as we stated in *Audubon I,* "we expect will be an expeditious reconsideration." 717 F.Supp. at 1424. The Corps shall file that determi-

nation with the Court within 180 days of the date of this Order.

## II. DISPOSITION OF REMAINING ISSUES

■ Several other issues warrant discussion.

### A. *Other Waters*

"Waters of the United States" are defined to include:

all *other waters* such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect interstate or foreign commerce....

33 C.F.R. § 328.3(a)(3) (emphasis added). The Corps' comments to the final regulations state that "we generally do not consider the following waters to be 'waters of the United States';"

(e) Waterfilled depressions created in dry land incidental to construction activity ... unless and until the construction or excavation operation is abandoned and the resulting body of water meets the definitions of waters of the United States....

51 Fed.Reg. 41,206, 41,217 (1986).

Based upon its finding that the Port had abandoned the northwestern portion of the site, the Corps found that several large bodies of water which had collected on the northwestern portion of the site were "other waters of the United States" and thus subject to Corps jurisdiction. Similar bodies found on the southern portion of the site remained non-jurisdictional "waterfilled depressions" incident to construction, because that portion of the site remained nonabandoned. The Port contends that the Corps's decision that it had abandoned the northwestern portion of the site was arbitrary because it ignored the "nature" of

the site and the Port's long-term plans for site development. Plaintiffs contend that the Corps underestimated the amount of the site that the Port had abandoned.

There is ample evidence in the record to support the Corps' determination that the northwestern portion of the site was abandoned by the Port. The Corps identified only two minor fills on that portion of the site between 1972 and 1986, and found that, contrary to the Port's assertions, there was no evidence to indicate that such a long "waiting" period was necessary before construction could continue on the site. This type of factual determination—as the Corps termed it, "judgment call"—is precisely the type of determination that the Corps is entrusted to make. Such determinations are entitled to substantial deference, and will not be upset by this Court unless they are arbitrary and capricious, or otherwise contrary to law. *See Avoyelles,* 715 F.2d at 911. We find no clear error in judgment in the Corps' determination of abandonment, and both Plaintiffs' and the Port's motions for summary judgment on this point are DENIED.[6]

### B. *"Typical" vs. "Atypical" Site Methodology*

The parties disagree about the methodology used by the experts in preparing their reports. Plaintiffs' experts used the methodology for "altered" or "disturbed" sites—generally termed "atypical" sites. Plaintiffs contend that because of the Ports' filling activities until 1986, the site was disturbed and therefore methods for "disturbed sites" should have been employed to evaluate the site. The Corps and the Port contend that these experts inappropriately used that methodology—and thus discount their reports—because that methodology is not to be used "if the activity occurred prior to the effective date of regulation [1975] or other jurisdiction." They contend that the filling in this case took place on a site that had been legally

6. The Corps also asserted jurisdiction over a small tidally influenced area in the northeastern corner of the site. Although the Port asserts that there is evidence that that area of the site is above both the MHW and the MHHW lines, the

administrative record fully supports the Corps' conclusion that the area is *below* the high tide line. The Port's motion for summary judgment on this issue is DENIED.

converted to upland before the Corps obtained jurisdiction over wetlands under the Clean Water Act.

It appears that the answer to which methodology should have been used is dependent upon when Corps jurisdiction attached to the site. Because the Corps has yet to reach a legally sound jurisdictional determination, evaluation of this issue would be premature. We therefore reach no conclusion as to which methodology was the appropriate methodology for evaluating the site, and express no opinion on that issue.

IT IS SO ORDERED.